UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

SANTO FELIBERY

Defendant

CRIMINAL No. 23-CR-10127-LTS

**GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT**

The government hereby files its formal objections to the Presentence Report ("PSR") by Probation issued on March 7, 2024.

**STANDARD OF REVIEW**

"The government bears the burden of proving a sentencing enhancement by a preponderance of the evidence." United States v. Newton, 972 F.3d 18, 20 (1st Cir. 2020). "It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its determinations on 'any evidence that it reasonably finds to be reliable.'" United States v. Lacouture, 835 F.3d 187, 189–90 (1st Cir. 2016) (quoting United States v. Almeida, 748 F.3d 41, 53 (1st Cir. 2014)).

I.  **THE GOVERNMENT HAS PROVEN THE +4 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2K2.1(B)(6)(B), BECAUSE THE DEFENDANT "POSSESSED FIREARM OR AMMUNITION IN CONNECTION WITH ANOTHER FELONY OFFENSE."**

II. **THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(B)(16)(B) BECAUSE THE OFFENSE INVOLVED "POSSESSION OF A DANGEROUS WEAPON (INCLUDING A FIREARM) IN CONNECTION WITH THE OFFENSE."**

A.  **OBJECTIONS**

The government objects to the PSR not finding that the Offense Level for Group Two is increased by 4 for the possession of the firearm "in connection" with another felony offense under USSG §

2K2.1(B)(6)(B). See PSR 234-239. The government contends that the Offense Level for Group Two should be increased by 4 with the inclusion of this enhancement.

The government further objects to the PSR not finding that the Offense Level for Group One is increased by 2 for the possession of the firearm "in connection" with the charged offenses under USSG § 2B1.1(B)(16)(B). See PSR 226-233.

Accordingly, if Group Two is increased by +4 to Offense Level 18, then Group One and Group Two may be within sufficient levels of seriousness to cause the offense level to increase under the grouping principals of USSG § 3D1.4(c). See PSR 240-247.

While Section 2K2.1(b)(6)(B) applies when the firearm is possessed in connection to "another felony offense," Section 2B1.1(b)(16)(B) requires the firearm to be possessed in connection to the charged theft-related offense. The government contends that both offense characteristics are satisfied in this scenario. Moreover, the language of the offense characteristics – "in connection with" – is identical in both Sections. The government therefore groups these objections together because the "in connection" language is identical in both offense characteristics, and the legal argument and factual basis supporting their application based on the firearm is identical as well.

**B.      GOVERNING LAW**

The specific offense characteristic found in USSG § 2K2.1(b)(6)(B) provides for a 4-level enhancement "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense."[1] The application notes specify that § 2K2.1(b)(6)(B) applies "if the firearm ... facilitated, or had the potential of facilitating, another felony offense." cmt. n.14.  Similarly, Section 2B1.1(b)(16)(B) provides for 2-level enhancement if the offense involved "possession of a dangerous weapon (including a firearm) in connection with the offense."

---

[1] The Sentencing Guidelines define "another felony offense" as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 cmt. n.14(C).

The First Circuit has "given the phrase 'in connection with' its plain and broad meaning." United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011). In short, the gun must "'somehow aid or facilitate, or have the potential to aid or facilitate, the commission of [the] offense." United States v. Matthews, 749 F.3d 99, 105 (1st Cir. 2014) (cleaned up).  Simply put, "satisfying the 'in connection with' requirement under § 2K2.1(b)(6)(B), and 2B1.1(b)(16)(B) 'is not especially burdensome.'" United States v. Mitchell, 78 F.4th 661, 671 (4th Cir. 2023).

 To that end, the phrase "in connection with" "neither requires 'actual use of the weapon during commission of the [offense] or physical proximity between the weapon and the contraband.'" Matthews, 749 F.3d at 105. Indeed, "a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply." United States v. Wen, 2023 WL 3495820, *1 (9th Cir. May 17, 2023). Rather, as the First Circuit has "previously held, '[t]he key question is whether a sufficient nexus exists between the weapon and the [offense]. If a firearm somehow aids or facilitates, or has the potential to aid or facilitate, the commission of [the theft] offense.'" Paneto, 661 F.3d at 717. "The plain and commonly understood meaning of 'facilitate' is to make easier." United States v. Marrufo, 661 F.3d 1204, 1207 (10th Cir. 2011).

Case law provides various examples of how a firearm can facilitate a theft offense, including:

- **Securing the tools used in the offense from theft**; United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018) ("On this record, it is reasonable to conclude that the possession of the firearm—even if found within his home—emboldened Bjerke to acquire and maintain possession of collocated burglary tools.");

- **Securing the stolen property**; United States v. Basnett, 735 F.3d 1255, 1262 (10th Cir. 2013) ("The court could legitimately have inferred that Mr. Basnett needed to keep the guns to secure his stolen property."); United States v. Gattis, 877 F.3d 150, 161 (4th Cir. 2017) ("the handgun that he was carrying at the time of his January 12 arrest clearly 'had the potential of facilitating' the ongoing conspiracy by serving as a potential means of protecting the stolen goods."); United States v. Ross, 837 Fed. Appx. 617, 628-629 (10th Cir. 2020) ("The considerable amount of stolen merchandise on Mr. Ross's property provided a plausible factual basis for the court to find that the simultaneous presence of the firearms had the potential to facilitate Mr. Ross's stolen-property offense.")

- ***Emboldening the Defendant or conspirators engage in the theft offense***; United States v. Cannon, 589 F.3d 514 (1st Cir.2009) (emboldening the enterprise); United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018); United States v. Justice, 679 F.3d 1251, 1255 (10th Cir. 2012) (collecting cases recognizing emboldenment theory);

- **Intimidating those who would retake stolen property**; United States v. Sanchez, 22 F.4th 940, 942 (10th Cir. 2022) (affirming enhancement because defendant "could have carried gun to intimidate anyone who sought to interfere with his possession" of a stolen vehicle).

Numerous Court have found the colocation of firearms, stolen property and implements of the theft crimes to be sufficient for the firearm to be possessed "in connection" with charged theft counts and related conspiracies based on the firearms ability to embolden the offender, protect the ongoing conspiracy, and safeguard the stolen property.  The government offers the following exemplary cases:

- United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018) ("On this record, it is reasonable to conclude that the possession of the firearm—even if found within his home—emboldened Bjerke to acquire and maintain possession of collocated burglary tools.");

- United States v. Agor, No. CR 21-00136 HG-01, 2023 WL 8780649, at *5 (D. Haw. Dec. 19, 2023) ("Defendant Agor possessed the firearm and the two knives in connection with the bank theft crime. Defendant Agor possessed the weapons to protect the proceeds that he stole and to avoid detection and responsibility for the offense.").

- United States v. Gattis, 877 F.3d 150, 161 (4th Cir. 2017) ("Specifically, in addition to the evidence just noted, the record indicates that when police searched Watson's residence and property on January 13, 2016, they recovered thousands of dollars worth of items that had been stolen during at least six different burglaries in four different counties between November 13, 2015, and January 7, 2016. The record thus showed sufficiently both that Gattis had committed at least one other felony offense—namely, an ongoing felony conspiracy—and that he possessed a firearm 'in connection' with that felony offense, as the handgun that he was carrying at the time of his January 12 arrest clearly 'had the potential of facilitating' the ongoing conspiracy by serving as a potential means of protecting the stolen goods.");

- United States v. Rogers, 594 F.3d 517, 522 (6th Cir.2010) (upholding application of the enhancement because the defendant's possession of a gun at his home had the potential to facilitate his unlawful "chop-shop," because "chop-shop customers are by definition not law-abiding" and the defendant could not call the police if a customer decided to steal his parts), vacated on other grounds, 131 S. Ct. 3018, 180 L.Ed.2d 842 (2011) (mem.);

- United States v. Valenzuela, 495 F.3d 1127, 1135 (9th Cir. 2007) (explaining that where defendant had a firearm under his seat, the firearm could have reasonably emboldened his possession of stolen property).

- United States v. Maxey-Vasquez, 2022 WL 3715869, at *2-3 (D. Nm. 2022) (upholding enhancement where Defendant was charged with receipt of stolen goods while a firearm was in the vicinity, and the court found that the firearm "had the potential to facilitate receipt of the stolen [goods]" as it might "embolden him to retain possession" if confronted by law enforcement.)

- United States v. Walters, 269 F.3d 1207, 1219 (10th Cir. 2001) (affirming enhancement where District Court found "possessing the gun had 'the potential to facilitate' the offense of keeping the stolen truck because it "emboldened" Walters to maintain possession of the truck 'vis-a-vis Mr. Center or anyone else for that matter.'").

- Ervin v. United States, 2014 WL 856526, at *3 (W.D.Mo. 2014) ("[the defendant] pled guilty to possessing three firearms and the searches of her home revealed several stolen items. From this, it is plausible that the possession of the firearms had the potential of facilitating her dealing in stolen property, and, accordingly, the four-level enhancement was warranted in this case.").

- United States v. Routon, 25 F.3d 815, 819 (9th Cir. 1994) (upholding enhancement where Defendant kept gun in stolen car; "Routon's gun emboldened him to maintain unlawful possession of the Cadillac")

- United States v. Sanchez, 22 F.4th 940, 942 (10th Cir. 2022) (affirming enhancement because defendant "could have carried gun to intimidate anyone who sought to interfere with his possession" of a stolen vehicle).

- Pridgette v. United States, 2020 WL 7081578, at *3 n.2 (D.Id. 2020) (noting that enhancement was properly applied for "multiple felonies—possession of a counterfeit access device and possession of a counterfeit access device making equipment under 18 U.S.C. § 1029(a)(3)–(4), (c), and transportation of a stolen vehicle under 18 U.S.C. § 2312.")

Compare United States v. Tirado-Nieves, 982 F.3d 1, 3 (1st Cir. 2020) (upholding enhancement under 2K2.1(b)(6)(B) because "[t]he firearms were found in close proximity to drugs, drug manufacturing materials, and drug paraphernalia" and "the presence of the firearm[s] has the potential of facilitating another felony offense, which in this case is drug trafficking")

### C.   ARGUMENT

The firearm in this case was possessed in connection with the charged theft offenses, which satisfies both USSG § 2K2.1(b)(6)(B) and USSG § 2B1.1(b)(16)(B).  See PSR ¶¶198-201. The firearm protected the property stolen during the theft conspiracy, secured the very tools used during the thefts, and had the potential of emboldening the conspirators and the Defendant.

To start, the firearm was found in the garage, feet away from property stolen during the conspiracy (six clean-cut catalytic converters), and close at hand to the very tools used in the catalytic converter thefts as recently as the night before.  These tools included Milwaukee brand tools and sawzalls consistent with the ones used during the theft conspiracy, and the blue car jack.  Furthermore, the Defendant's truck was

5

parked in the driveway and had stolen rims and tires on it. See PSR 187-191. The firearm was also near body armor vests. This alone suggests that the Defendant was equipped to protect himself and the tools and property from gunfire (by virtue of the body armor) and return fire if necessary (through use of the gun). Moreover, when the MAROON ACURA MDX needed repairs and had been identified during the incident on 12/22/2022, the Defendant and R. DAVILA brought the vehicle directly to the Defendant's residence and parked it at the garage, while it underwent repairs.

Additionally, over 900 rounds of ammunition were found within the Defendant's home in the basement closet. Within that same closet were a number of oxygen sensors taken from stolen catalytic converters. These rounds of ammunition included 9mm ammunition, the same caliber that the firearm was chambered to accept, and hundreds of other calibers.

This alone is sufficient to demonstrate that the firearm and ammunition were possessed in connection with the theft charges. "From the volume of stolen property, gun[], and ammunition .. the sentencing judge could reasonably infer that that [the Defendant] kept the gun[ and ammunition] in connection with his transportation of stolen property." United States v. Basnett, 735 F.3d 1255, 1262 (10th Cir. 2013) ("The court could legitimately have inferred that Mr. Basnett needed to keep the guns to secure his stolen property."); see also United States v. Ross, 837 Fed. Appx. 617, 628-629 (10th Cir. 2020) ("The considerable amount of stolen merchandise on Mr. Ross's property provided a plausible factual basis for the court to find that the simultaneous presence of the firearms had the potential to facilitate Mr. Ross's stolen-property offense.").

The gun, ammunition and related body armor also had the potential to embolden the Defendant and the conspiracy. It is no coincidence that the Defendant kept a firearm and body armor close at hand to where he stored tools used in the thefts, and a number of stolen catalytic converters. The Defendant had been **twice** confronted by victims– once during the December 21, 2022, incident where the homeowner smashed out the rear windshield, and a second time by the owner of the rims of the truck. They also engaged in ***multiple*** high-speed chases with police as they fled from the catalytic converter theft on 12/22/22 and

6

the scenes of their ATM thefts.  See PSR 118 (lights off flight from Tyngsboro ATM theft), 134 (flight from Maynard Police during Concord ATM theft).  All this within a short window of a few months.

Given these brushes with law enforcement and outraged victims in a short time span, it is not some remote inference that an enterprising police officer might identify them, or some victim might follow them and attempt to take matters into their own hands.  The firearm, loads of ammunition and body armor clearly had the potential of emboldening the Defendant and this enterprise in the face of any such resistance.

The Defendant was also part of tight-knight crew that had operated for years. Past convictions noted that R. DAVILA, FELIBERTY and OYOLA were engaged in thefts for over a decade.  See PSR 250 (government has furnished police report as part of these objections), 252, 253; Exhibit 6, 7, 8 to Sentencing Memorandum. Over the years, this crew was opportunistic and targeted catalytic converters, ATMs, vehicles, jewelry stores and any other property they could take away.  Firearms were not some foreign object to this crew – rather they were commonly held tools of the trade, and firearms were recovered alongside tools and stolen property at R. DAVILA's residence and N. DAVILA's residence. See PSR 192-197 (firearm recovered from N DAVILA's residence); 202-206 (multiple firearms recovered from R DAVILA's residence and vehicle).

Moreover, the Defendant "was no ordinary gun owner. He had a prior felony that made it illegal— and thus particularly risky—for him to possess the pistol in question."  Matthews, 749 F.3d at 107.  In fact, two of the Defendant's prior convictions and state prison sentences were for theft offenses that bore a marked similarity to the theft conspiracy for which he is now convicted and involved the same individuals (PSR 250-253). All of this suggests that the Defendant possessed the firearm in connection with the theft offenses, and the enhancements should be applied.

**D.     RESPONSE TO PROBATION'S POSITION IN PSR**

The government responds to Probation's positions in the PSR. First, Probation complains that the government's argument includes "only several … decisions … from the First Circuit, and each case turns on its own unique fact pattern." PSR, p. 96. For its part, Probation cited three cases from the 11th Circuit in its response, and offers zero cases from the First Circuit for its position that the evidence does not support

the fact that the firearm was possessed in connection with the offense.[2]  Indeed, two of the cases cited by Probation involved lawfully possessed firearms, and neither involved the actual use of the firearms during the commission of the offense, which appears to be the standard that Probation is reading into the guideline. See Delva, at 1256 ("Kenny was the registered owner of the firearms); United States v. McClain, 252 F.3d 1279, 1288 (11th Cir. 2001) ("it is certainly reasonable to infer that Tucker carried the firearm to prevent a "rip-off").[3]  Both cases actually support the government's position, and offer no basis to overrule the government's objection.[4]

Probation then claims "[t]here is no evidence that garage was used in the conspiracy." PSR 96.[5] That is a contorted view - the garage contained stolen catalytic converters and the very tools used by the Defendant to steal them, which Probation acknowledges elsewhere.  See PSR 97 (as Probation notes elsewhere, "the firearm was found near a few items of stolen property and tools [(used during the offenses)] during a search of the defendant's residence.").  The car jack and tools were used by the Defendant on April 6, 2023, and April 11, 2023, to steal over a dozen catalytic converters, and then the tools and stolen converters were found on April 12, 2023, in the garage.  The instrumentalities and fruits of the theft offense were stored next to the firearm, which is ample basis to conclude the firearm was possessed in connection with the theft offense. The Court should sustain the government's objection and find the enhancements proven.

---

[2] The only pertinent case cited by Probation, United States v. Delva, 922 F. 3d 1228 (11th Cir. 2019), acknowledges that "mere possession of a firearm during the commission of an offense can, in certain circumstances, be sufficient to apply a sentencing enhancement." Id. at 1255.  In Delva, the Defendants were not felons and the firearms were otherwise lawfully possessed, and the Defendant acknowledged in statements to police that the firearms were for protection.

[3] Probation improperly cited this case as being from 2019. It is a 2001 case.

[4] The other case cited by Probation, United States v. Jackson, 276 F.3d 1231 (11th Cir. 2001), involved possession of a firearm during an assault of a police officer, and is clearly in apposite.

[5] The absence of "surveillance videos" showing the Defendant going into and out of the garage is also no reason to not apply the enhancement.  Under this fanciful standard, no enhancement could be applied without criminals undertaking efforts to film themselves utilizing each and every premises where they stored instrumentalities used in their crimes.

III.   **THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(B)(16)(B) BECAUSE THE OFFENSE INVOLVED "POSSESSION OF A DANGEROUS WEAPON" "IN CONNECTION WITH THE OFFENSE" APART FROM THE FIREARM**

   A.   **OBJECTION**

The government further objects to Probation's failure to find that the Offense Level for Group One is increased by 2 for the possession of the other dangerous weapons (beside the firearm), including the reciprocating saws, blades, hammers, trucks, and chains "in connection" with the charged offenses under USSG § 2B1.1(B)(16)(B).

   B.   **GOVERNING LAW**

The specific offense characteristic found in USSG § 2B1.1(b)(16)(B), calls for a two-point increase, "if the offense involved … (B) possession of a dangerous weapon (including a firearm) in connection with the offense." The term "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury." USSG § 1B1.1, cmt. n.1(E), Therefore, the offense characteristic should be applied when the "offense involved possession" of "an instrument capable of inflicting death or serious bodily injury" "in connection with the offense."

Importantly, "a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply." United States v. Wen, 2023 WL 3495820, *1 (9th Cir. May 17, 2023) (unpublished, cited pursuant to Fed. R. Crim. P. 32.1; Ninth Circuit Rule 36-3(b)); United States v. Walker, 89 F.4th 173, 182-183 (1st Cir. 2023).  The case of United State v. Wen is instructive.

In Wen, the Ninth Circuit concluded that a "car, hammer, box cutter, and rope are all self-evidently instruments *capable* of inflicting death or serious bodily injury, so the district court did not err in concluding that they constituted dangerous weapons within the meaning of § 2B1.1(b)(16)(B)." Id. (emphasis added). In *Wen*, the defendant argued that "those items could not have constituted dangerous weapons under § 2B1.1(b)(16)(B) because he did not actually *use* them in a threatening manner." Id. The Court rejected that interpretation, holding that "[n]either [the definition of dangerous weapon under USSG § 1B1.1 cmt. n.1(E),] nor U.S.S.G. § 2B1.1(b)(16)(B) itself requires actual use of the items to inflict serious bodily injury.

The car, hammer, box cutter, and rope are all self-evidently instruments **capable** of inflicting death or serious bodily injury." Id. at *1 (citations omitted, emphasis added).

Similarly, in Wen, the defendant utilized those tools and the vehicle during the commission of the offense, which was the damage to property owned by a foreign government.  There, the defendant claimed that the government had to prove "that he *used* the items in his possession to inflict serious bodily injury" – i.e., as a weapon against another person -- in order for § 2B1.1(b)(16)(B) to be proven.  Id.  The Ninth Circuit rejected that argument, because the items that could be used as dangerous weapons did not need to be in fact used as weapons during the offense at all. Id. ("This argument depends entirely on the contention we reject above: that the Guidelines requires use of the weapon in the offense."); United States v. Agor, No. CR 21-00136 HG-01, 2023 WL 8780649, at *5 (D. Haw. Dec. 19, 2023) (citing Wen, "Contrary to Defendant's position, a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply.").  Indeed, in Wen the Ninth Circuit concluded that the defendant possessed those dangerous weapons and that they in fact "directly facilitated the offense of damaging property occupied by a foreign government" despite not being used to harm or threaten anyone. Wen, 2023 WL 3495820, at *1-2.

The same logic regarding the definition of dangerous weapon and that the weapon need not be used against a person, or even used during the offense was also recently discussed in the First Circuit case, United States v. Walker, 89 F.4th 173, 182-183 (1st Cir. 2023). In Walker, the defendant was charged with Hobbs Act robbery conspiracy, and possessed a crowbar, screwdriver, and razor blades in a vehicle. There, the defendant claimed "the government failed to prove that Walker intended to use the crowbar, screwdriver, and razor blades as weapons" during the anticipated robbery, and that the dangerous weapon enhancement should not, therefore apply.  Id.  The First Circuit held that the defendant was "incorrect as a matter of law that the Guidelines require such proof." Walker, 89 F.4th 173 at 182.  Rather, the Court held that "the plain meaning of the Guidelines supports the government's view that Walker needed only to 'specifically intend'

to 'possess' the items *in connection* with the robbery." <u>Id.</u> at 183 (emphasis added);[6] <u>United States v. Pope</u>, 554 F.3d 240, 246 (2d Cir. 2009) (affirming application of enhancement based on possession of a sledgehammer, observing that a requirement that the defendant must have intended to use the item as a weapon "would directly contradict the plain meaning of this provision of the Guidelines, and would lead to absurd results," including that "a burglar could enter a bank carrying several guns and explosives and remain exempt from the two-level sentencing enhancement so long as those 'tools of the trade' were used only to break open the safes"); <u>United States v. Lavender</u>, 224 F.3d 939, 941 (9th Cir. 2000) (same, based on possession of a screwdriver). The <u>Walker</u> case also relied upon the reasoning from <u>United States v. Pope</u> in that it confirmed "that the dangerous-weapon enhancement applies when the defendant intended to possess a dangerous weapon — regardless of how the item would be used to facilitate the offense." <u>Walker</u>, 89 F.4th at 182-185.

Consequently, the case law is clear that § 2B1.1(b)(16)(B) only requires that the Defendant possessed "an instrument capable of inflicting death or serious bodily injury" in connection with the charged offense, not that the instrument actually be used to inflict bodily injury during the offense.

### C.    ARGUMENT

The evidence separately proves that the Defendant possessed reciprocating saws, hammers, stolen trucks, and hooked chains -- "instruments capable of inflicting death or serious bodily injury," USSG 1B1.1, cmt. n.1(E) -- during the thefts of catalytic converters from the vehicles, commission of the jewelry store burglaries, and ATM thefts. Under the governing law described above, the reciprocating saws, hammers, stolen trucks, and hooked chains that were actually used by the Defendant and his conspirators during the charged offenses are "dangerous weapons," even if they are not used against the person of another or not used with an intent to cause physical injury.  See e.g., PSR 117-144 (ATM thefts); 145-169 (jewelry store burglaries). Consequently, the enhancement under USSG 2B1.1(b)(16)(B) should also be applied based on

---

[6]<u>See</u> <u>United States v. Matthews</u>, 749 F.3d 99, 105 (1st Cir. 2014) *(*the phrase "in connection with" "neither requires 'actual use of the weapon during commission of the [offense] or physical proximity between the weapon and the contraband").

the tools and implements that meet the definition of dangerous weapon, which the Defendant and his conspirators used to actually commit the charged offenses.

Here, of course, the reciprocating *saws*, *hammers*, *hooked chains*, and *trucks* were actually used by the Defendant and his coconspirators to conduct the thefts. These specific items are all "self-evidently" instruments capable of causing serious bodily injury or death. See Wen, 2023 WL 3495820, at *1-2 ("car, hammer, box cutter, and rope are all self-evidently instruments *capable* of inflicting death or serious bodily injury"); Walker, 89 F.4th at 182-183 (crowbar, screwdriver, and razor blades were dangerous weapons). Indeed, multiple hammers were not just possessed during the offense, but actually used by the Defendant and his coconspirators to destroy the glass doors to the jewelry stores and vape store and also to break the display cases to steal the jewelry. See PSR 145-169 (jewelry store burglaries and conspiracy). Similarly, the multiple stolen trucks and hooked chains were not just possessed, but (again) actually used to rip the ATMs out of their emplacements in order to steal.  See PSR 117-144 (bank ATM thefts and conspiracy).

Consistent with the clear definition, these instruments were certainly used in connection with the offense to accomplish the actual thefts.[7]  This actual use of the dangerous weapons during the commission of the thefts clearly establishes their possession "in connection with" the offenses in Group One – indeed these implements directly facilitated the thefts.  See United States v. Matthews, 749F.3d 99, 105 (1st Cir. 2014) ("in connection with" means "somehow aid or facilitate, or have the potential to aid or facilitate, the commission of [the] offense"). Consequently, the Defendant's use of these instruments capable of causing death or serious bodily injury during the actual theft offenses supports the application of USSG § 2B1.1(B)(16)(B) and the offense level for Group One should be increased by two.

D.        **RESPONSE TO PROBATION'S POSITION IN PSR**

The government objects in that Probation's justification for not applying the enhancement to be flatly contrary to established First Circuit precedent.

---

[7] Indeed, if these "dangerous weapons" were applied against another person, the crimes would be robberies, not thefts, and an entirely different guideline would apply.

To start, Probation claims that "[a]pplying this enhancement in the context that the government suggests would turn every multi-purpose item into a dangerous weapon and necessitate a two-level increase." PSR 100. This is not the government's position. And for good reason, not every 'multi-purpose item' is "capable of inflicting death or serious bodily injury." See USSG 1B1.1, cmt. n.1(E) ("instrument capable of inflicting death or serious bodily injury"). Probation has ruled, contrary to First Circuit precedent, that "the offense of conviction and corresponding guideline play a significant role in determining whether instruments used to commit thefts are also considered to be dangerous weapons, given the context of the crimes and the totality of the circumstances." PSR, p. 100. That is simply not an accurate statement of the guidelines, which provides a categorical definition for dangerous weapon. Furthermore, Probation's position calls for an elastic and situational definition of dangerous weapon that is impermissibly vague. In short, USSG 1B1.1, cmt. n.1(E) categorically defines a dangerous weapon by the capability of the instrument, and makes no reference to the nature of the crime during which the weapon is possessed, or the context of its use during that crime. This is the understanding described in Walker, and the cases it cites, including Pope. Walker, 89 F.4th at 182-185. Probation's position exceeds the plain language of the guideline and should be discarded.

Probation's position regarding the use of the instrument capable of causing death or serious injury is also contrary to Walker. Specifically, Probation claims that "[t]here must be some evidence that the defendant intended to use a multi-purpose item as a weapon, and that is not present in this case." PSR, p. 100. This requirement is not found in the guidelines for the offense, or the definition of dangerous weapon. The First Circuit in considering identical language under the robbery guideline concludes that a dangerous weapon does not need to be so used, and no other Circuit has taken the position that Probation has now set. Cf. Walker, 89 F.4th at 183 ("Our understanding of the dangerous-weapon enhancement is consistent with the case law of our sister circuits, and we can identify no out-of-circuit precedent adopting [Defendant's] interpretation.").

13

In fact, <u>Walker</u> includes a lengthy discussion of other cases about whether the "dangerous weapon" needs to be used during the offense.[8] The Court in <u>Walker</u> cites two cases that the government previously cited as well:  <u>United States v. Lavender</u>, 224 F.3d 939, 941 (9th Cir. 2000) (rejecting defendant's argument that "dangerous weapons should be considered dangerous weapons for sentencing purposes only when they are carried with the intent to use them as weapons"); and <u>United States v. Pope</u>, 554 F.3d 240, 246 (2d Cir. 2009)  (same regarding the burglary Guideline).

The Second Circuit case of United States v. <u>Pope</u>, which the government originally cited, is a very factually similar case. <u>Pope</u> involved the use of a sledgehammer to commit a burglary of bank, which, like the facts here, was not occupied at the time, and the Court determined that the dangerous weapon enhancement should apply.  See Pope, 554 F.3d at 242-243. "The fact that [the Defendant] did not use the sledgehammer *as a weapon* is irrelevant to the issue of possession." <u>Pope</u>, 554 F.3d at 246. The Second Circuit continued:

> To hold otherwise would directly contradict the plain meaning of this provision of the Guidelines, and would lead to absurd results. For example, a burglar could enter a bank carrying several guns and explosives and remain exempt from the two-level sentencing enhancement so long as those "tools of the trade" were used only to break open the safes.

<u>Id</u>.  So too here, the fact that the Defendant did not use the trucks, chains, reciprocating saws, hammers or other implements "*as a weapon* is irrelevant to the issue of possession." <u>Pope</u>, 554 F.3d at 246.  As the First Circuit similarly concludes, in accordance with <u>Pope</u> and <u>Lavender</u>: the "text of the robbery Guideline clearly states that the relevant offense conduct is the 'possess[ion]'" of a dangerous weapon" and "[b]ecause the action is contained in the word 'possess[ion],' the plain meaning of the Guidelines supports the government's view that Walker needed only to 'specifically intend[]' to "possess[]" the items in connection

---

[8] The First Circuit also cites <u>United States v. Lavender</u>, which was cited by the Ninth Circuit in <u>Wen</u>, and by the government in its objection. See <u>United States v. Lavender</u>, 224 F.3d 939, 941 (9th Cir. 2000) (rejecting defendant's argument that "dangerous weapons should be considered dangerous weapons for sentencing purposes only when they are carried with the intent to use them as weapons");

with the robbery." Walker, 89 F.4th at 183. So too here, the relevant guideline relates to "possession of a dangerous weapon (including a firearm) in connection with the offense." USSG 2B1.1(b)(16)(B)).

The government further notes that Probation's self-created requirement that the "instrument capable of inflicting death or serious bodily injury" be used as a weapon against another person would also create a second absurd result apart from the one identified in Pope. If the "instrument capable of inflicting death or serious bodily injury" must be used as a weapon against another person to accomplish the theft, as Probation contends, then the crime will by definition always be a robbery, and never simply a theft. See e.g., 18 U.S.C. § 1951(b)(1) ("The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining."). Accordingly, there would be no circumstances where the enhancement could apply. For all the reasons set forth above, the government requests that the Court sustain the government's objection and find the enhancement proven on this ground as well.

## IV. THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(B)(10)(C) WHERE THE OFFENSE OTHERWISE INVOLVED "SOPHISTICATED MEANS"

### A. OBJECTION

The government objects to the PSR not finding that the Offense Level for Group One is increased by 2, where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2K2.1(B)(10)(C).

### B. GOVERNING LAW

Under USSG §2B1.1(b)(10)(C), the offense level is increased by 2 levels if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2B1.1(b)(10)(C). "Sophisticated means need not be highly sophisticated. The application of [t]he sophisticated-means enhancement is proper when the offense conduct, viewed as

a whole, was notably more intricate than that of the garden-variety [offense]." United States v. Norwood, 774 F.3d 476, 480 (8th Cir. 2014) (per curiam) (alterations in original) (internal quotation marks omitted)

The commentary to the guidelines defines "sophisticated means" and provides an exemplary list of conduct that satisfies the definition:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1 cmt. n.9(B).  "The enumerated examples are by no means exhaustive, and as other circuits have recognized, 'the enhancement properly applies to conduct less sophisticated' than the examples." United States v. Foley, 783 F.3d 7, 25 (1st Cir. 2015), quoting United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir.2013) (collecting cases).  Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." United States v. Evano, 553 F.3d 109, 113 (1st Cir.2009); Foley, 783 F.3d at 25. In short, the "defendant need not have done any of the things listed in order to qualify for the enhancement, so long as the offense as a whole shows 'a greater level of planning or concealment' than a typical [theft] of its kind.'" United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015).

Indeed, "[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." United States v. Garbacz, 33 F.4th 459, 474 (8th Cir. 2022).  "Overall, the sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place." United States v. Meadows, 866 F.3d 913, 917-18 (8th Cir. 2017). In short, if the steps taken by the conspiracy "make their scheme more effective and difficult to thwart," that "it is enough to justify the enhancement."  Evano, 553 F.3d at 113; see United States v. Davis, 753 F. App'x 154, 157 (4th Cir. 2018) (sophisticated means where the 'total scheme' was also 'sophisticated in the way all the steps were linked together'").

Lastly, "[t]he sophisticated-means enhancement is appropriate when 'the defendant intentionally engaged in or caused the conduct constituting sophisticated means.' Nothing in this language limits application of the enhancement to only the mastermind of the scheme." United States v. Muresanu, 951 F.3d 833, 840 (7th Cir. 2020) (citation omitted). Consequently, the offense level should be increased even if he does not serve in an aggravating role, if his participation in the scheme entailed knowledge and understanding that these sophisticated elements were present.

### C.    ARGUMENT

The offense here clearly involved sophisticated means.  In this case, the efforts of the Defendants to plan, execute, and conceal the scheme were extremely effective, and facilitated nearly 500 individual thefts on nearly 100 separate nights for over a year.  The Defendant participated in a sizeable percentage of them in a short window of about three months, while also targeting three ATMs, two jewelry stores, a vape store, hardware store, and a number of motor vehicles. This scheme was difficult to thwart and required the coordination of over 70 law enforcement agencies across three jurisdictions.

As noted above, the individual components need not be sophisticated if the scheme was sophisticated in its totality.  See Evano, 553 F.3d at 113.  The government offers a bullet point list of exemplary criteria that demonstrate, the "level of planning or concealment,'" Pacheco-Martinez, 791 F.3d at 179, that the offenses involved.:

- The Defendants used an anonymized vehicle well-suited and dedicated to the theft of catalytic converters. See PSR 17-25, 28-30. The conspiracy, and FELIBERTY in particular, had the ability to source replacement vehicles when that vehicle was not available.

- They employed anonymized license plates, and stole license plates to obscure the frequent use, ownership and common identity of the vehicle.  See United States v. Finley, 600 Fed. Appx. 964, 967 (6th Cir. 2015) (listing criteria for sophisticated means and noting conspirators "switched license plates"). See PSR 66-68, 134-135, 137, 146-148, 193.

- The conspiracy took place over a period of months and repeatedly committed hundreds of thefts, frequently conducting thefts multiple times per week. United States v. Garbacz, 33 F.4th 459, 474 (8th Cir. 2022) ("[r]epetitive and coordinated conduct"); United States v. Ouedraogo, 824 F. App'x 714, 724 (11th Cir. 2020) ("repetitive and lengthy course of conduct"). This crew targeted catalytic converters, ATMs and jewelry stores, demonstrating skilled and coordinated execution during each and every incident. The jewelry stores, for example, were burglarized within two minutes (PSR 117-144, 146, 152). The ATMs were targeted and ripped out of the foundation within moments, prior to police responding.

- The conspiracy involved multiple jurisdictions, with thefts across virtually every county in Massachusetts, New Hampshire, and Connecticut.  The thefts were spread across jurisdictions to avoid police interdiction and reduce the potential for coordinated investigation.  See United States v. Shifu Lin, 508 Fed. Appx. 398, 403 (6th Cir. 2012) (sophisticated means based on "cross-jurisdictional conduct and technical knowledge necessary to commit the offense").

- The thefts were well-planned over the internet to target dozens of vehicles in a single, identifying the specific makes and models used by certain businesses and targeting them at scale. See United States v. Jackson, 346 F.3d 22, 23–25 (2d Cir.2003) (upholding sophisticated means enhancement where defendant used internet to identify targets); United States v. Ghertler, 605 F.3d 1256, 1268 (11th Cir. 2010) (finding sophisticated means where defendant had to "conduct extensive research on the victim companies").  Those specific vehicles were targeted based on the prices set by the digital pricing application that was subscriber based.  The thefts entailed hundreds of miles of driving per night to strike the most number of valuable vehicles in a single night. See United States v. Clarke, 562 F.3d 1158, 1166 (11th Cir.2009) (noting in approving a "sophisticated means" determination that the scheme "covered a three-year period and required intricate planning").

- Logistics were handled by the leader, R. DAVILA, who charged the batteries, paid for the gas, did "homework" to plan the routes, stored the stolen property, bought snacks, paid for the pricing application, and noted the number and prices of catalytic converters. See PSR 29-32.

- The thieves employed specialized knowledge of automobiles such as knowing where the catalytic converters were located in the darkness of night and skillfully using the sawzalls and tools to cut them out of the vehicles within seconds. See United States v. Dawson, 588 F. App'x 890, 894 (11th Cir. 2014) (sophisticated means where "conduct involved numerous steps, affected multiple victims, spanned several years, and required specialized knowledge"); United States v. Stafford, 639 F.3d 270, 276 (6th Cir. 2011) (citing defendant's misuse of specialized knowledge in support of affirming the application of sophisticated means enhancement); Hopkinson v. United States, No. 10 CR 538, 2017 WL 5891262, at *6 (N.D. Ill. Nov. 29, 2017) ("specialized knowledge"); United States v. Rettenberger, 344 F.3d 702, 709 (7th Cir. 2003) (affirming a finding of sophisticated means where the appellant engaged in "[c]areful execution and coordination over an extended period." (alteration in original)).

- Torres, the regular fence for the catalytic converters, and charged coconspirator, created a "corporate shell" – Scrapguys413 LLC – to facilitate the transactions with the core buyers. See PSR 37-42; USSG § 2B1.1 cmt. n.9(B) ("Conduct such as.. the use of fictitious entities, corporate shells … also ordinarily indicates sophisticated means.")

- Defendants took steps to not generate a digital trail of CSLI evidence during the thefts. FELIBERTY employed a prepaid burner phone subscribed in a fictitious name and either powered down or left his primary phone at home during the thefts. See United States v. Kantete, 610 Fed. Appx. 173, 177 (3rd Cir. 2015) ("using multiple pre-paid telephones registered to other people or fictitious subscribers" supported sophisticated means).

- The thieves routinely engaged in chases with law enforcement and fled to neighboring jurisdictions. See PSR 117-169. This was in fact a historical pattern as well. See PSR 250, Exhibit 6 & 7 to Sentencing Memorandum.

- The conspirators employed a storage unit to store the stolen goods. <u>See</u> <u>United States v. Balde</u>, 616 F. App'x 578, 584 (4th Cir. 2015) (Finding sophisticated means where "merchandise purchased with the re-encoded cards was first kept in a storage unit and then sent to New York for sale."

In addition to the catalytic converter thefts, FELIBERTY also participated in the elaborate thefts from jewelry stores and ATMs.  The nature of those thefts also contribute to the sophisticated and repetitive nature of these crimes, such that the sophisticated means enhancement should apply. Specifically:

- For the jewelry store burglaries and ATMs, they cased the location, stole vehicles from neighboring jurisdictions and used them in the thefts. <u>See</u> <u>United States v. Mitchell</u>, 914 F.3d 581, 586 (8th Cir. 2019) (finding sophisticated means where defendant used a fraudulently obtained "vehicle, which allowed the defendants to travel to multiple states to make fraudulent purchases"); <u>United States v. Shifu Lin</u>, 508 Fed. Appx. 398, 403 (6th Cir. 2012) (sophisticated means based on "cross-jurisdictional conduct and technical knowledge necessary to commit the offense").

- The thieves employed techniques designed to distract law enforcement from the theft and conceal the crime from successfully investigation, such as using multiple stolen vehicles, follow cars, stolen license plates, and conducting distraction break-ins. <u>See</u> PSR 117-144, 145-169. They also were extremely opportunistic – they stole a trailer to facilitate their theft of grills and snowblowers later that night. They would then store the snowblowers and grills in a storage unit, with the stolen trailer nearby.

- For both the ATMs and jewelry stores, the thieves time on scene was limited to a specific duration, and the thefts were skillfully executed. They also successfully avoided police response. For example, the jewelry stores were equipped with tempered glass and the Defendant demonstrated his knowledge and experience in this area by smashing the front door in the corner, which is a weak spot.  For the ATMs, they utilized specialized chains with hooks and the ATMs were removed within seconds, and the vaults were compromised that night in foreign jurisdictions. <u>See</u> PSR 117-144, 145-169.

  o The Tyngsborough, MA ATM theft involved the theft of a truck from Connecticut, travel to Tyngsborough, MA, for the theft and later dumping the stolen truck in Windham, NH.  <u>See</u> PSR 118-126. The ATM parts were also dumped in New Hampshire, once the vault was opened.  FELIBERTY's personal cell phone (TARGET PHONE 5) was powered down for this incident, but his anonymous burner phone (TARGET PHONE 10) was brought for the incident. The theft was skillfully undertaken with chains and planned roles in the activity. The ATM was ripped off in seconds, and loaded into the truck.  The police response that took place within minutes, was evaded by fleeing into New Hampshire.

  o The planning of the Chelmsford, MA ATM theft involved a coordinated trip to scout the location. They took pictures of the ATM and discussed it.

- The Concord, MA ATM theft involved the use of spray paint to render the surveillance camera useless. Multiple vehicles were utilized and anonymized through the use of stolen license plates. FELIBERTY's personal cell phone (TARGET PHONE 5) was powered down for this incident, but his anonymous burner phone (TARGET PHONE 10) was brought for the incident. The theft was skillfully undertaken with chains and planned roles in the activity. The ATM was ripped off in seconds, and the police response that took place within minutes, was evaded by the use of multiple vehicles designed to thwart interdiction..

  - The truck used in the theft had a stolen plate that had been taken from an Andover, MA hotel on 11/24/22. The truck was dumped in Maynard following the chase of the Dodge Challenger.

  - R. DAVILA's high-end Dodge Challenger SRT was used as a bait car, and it also had a stolen plate obtained from the Andover, MA hotel on 11/24/22. This vehicle engaged in a high-speed chase designed to thwart law enforcement from stopping the truck.

- For the jewelry store burglaries, the conspirators travelled to the stores the night before and cased the locations. While in New Hampshire casing the location, they stole a vehicle, and stashed it overnight in a location in New Hampshire, so that it would ready for their use during the crimes the following night. They undertook a distraction burglary at a vape store designed to draw a police response. After the police responded to the distraction burglary, they made quick entry into the jewelry store, smashing the glass quickly through well-placed strikes with hammers. Once inside, this was an extremely well-executed burglary with obvious pre-planned timetables and coordination. All three conspirators were equipped with masks, gloves and bags to carry the loot. They exited the store with nearly $100,000 of jewelry in about two minutes.

The nature of these offenses described by the government is by no means exhaustive. The PSR amply describes in detail, the skillfully repeated and successful crimes committed by the Defendant. The execution of these crimes involved numerous specific types of conduct that have been determined to satisfy the "sophisticated" means enhancement.

These jewelry store burglaries were not typical smash and grab events. And the ATM thefts were well-planned and coordinated. The Defendants successfully evaded being caught night after night, which is a remarkable feat given the frequency of the activity, and brazen nature of the crimes. These circumstances, their skillfully employed techniques and disciplined actions across numerous nights of theft, which yielded success time and again, demonstrates "a greater level of planning or concealment than a typical [theft] of its kind." United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015). Therefore,

all the component parts of the Defendant's participation in these crimes, considered together, readily satisfy the sophisticated means requirement.

**D.     RESPONSE TO PROBATION'S POSITION IN PSR**

The government will address each of Probation's positions in turn.

First, Probation notes that "it is striking how repetitive and similar the conduct is in each incident" as a grounds to not find sophistication. PSR, p. 105. Indeed, repetitive conduct is itself a basis for finding sophisticated means. See United States v. Garbacz, 33 F.4th 459, 474 (8th Cir. 2022) ("[r]epetitive and coordinated conduct"); United States v. Ouedraogo, 824 F. App'x 714, 724 (11th Cir. 2020) ("repetitive and lengthy course of conduct").

Second, Probation claims the "use of various anonymized license plates on the Acura MDX was initiated by R. DAVILA, not this defendant." PSR, p. 105. For this, Probation does not even attempt to make an argument concerning the other thefts the Defendant planned and undertook. For example, this Defendant engaged in the Concord, MA ATM theft where two vehicles employed separate stolen license plates. They also stole a number of other vehicles to commit these other ATM and jewelry store thefts. They even stole a trailer that they used to steal other property.  R DAVILA did not commit these aspects of the crimes on his own or make the vehicles he already stolen available to the conspiracy. The members of the conspiracy stole them together and used them together.

Next, Probation claims "the number of thefts, locations of the thefts, the targeting of specific vehicles, and the logistics were all handled by R. DAVILA, not the defendant." Again, this position simply ignores the offense conduct. The Defendant went with R. DAVILA and OYOLA to case the jewelry stores the night before.  The Defendant went with R. DAVILA and OYOLA to steal the vehicle used in the jewelry store burglaries the night before as well. The Defendant went with R. DAVILA and OYOLA to Chelmsford with R. DAVILA to scout the ATM. To say that all the planning and preparation were handled by R. DAVILA alone is simply not accurate.

Then, Probation claims that "[w]hile the defendant used a burner phone, he used the same exact phone, TARGET PHONE 5, during the thefts." PSR, p. 105. As an initial matter, Probation is wrong on the

facts: TARGET PHONE 10 was the prepaid burner phone obtained under a fictitious name. See PSR 56-58.  TARGET PHONE 5 was in the Defendant's own name and generally was left at home or powdered down during the thefts. See PSR 55. Probation's point is also contrary to law; use of anonymized phones is an aspect of sophistication. See United States v. Kantete, 610 Fed. Appx. 173, 177 (3rd Cir. 2015) ("using multiple pre-paid telephones registered to other people or fictitious subscribers" supported sophisticated means).

Probation also claims the "defendant's knowledge of cars and ability to skillfully remove the catalytic converters, as well as his ability to quickly commit other thefts, while helpful, was not sophisticated." PSR, p. 105. This skill was not just "helpful" – it was essential to the success of the crimes and their skillful execution.  This Court should not ignore how well-coordinated and planned the thefts were, with stolen license plates obtained in advance affixed to multiple vehicles, multiple stolen vehicles used in coordination to commit the thefts and evade police, and cross-jurisdictional flights from law enforcement, all of which are criteria found to be indicative of sophisticated means.

Indeed, specialized knowledge is a well-recognized aspect of sophistication.  United tates v. Stafford, 639 F.3d 270, 276 (6th Cir. 2011) (citing defendant's misuse of specialized knowledge in support of affirming the application of sophisticated means enhancement); Hopkinson v. United States, No. 10 CR 538, 2017 WL 5891262, at *6 (N.D. Ill. Nov. 29, 2017) ("specialized knowledge"). Had the case gone to trial, the government certainly would have utilized expert testimony to describe catalytic converters, their role in a vehicle's exhaust system, their content, their location on a vehicle, and the manner and means by which they are affixed to the vehicle and various methods by which they can be quickly removed.  See Fed. R. Evid. 702.  The government would suggest that knowledge about where the converter is located and the best means to remove it within 60 seconds exceeds the ken of the average layperson or even average thief. Similarly, the skilled execution of: ATM thefts in a matter of seconds, jewelry store burglaries in a matter of minutes, and the theft of multiple vehicles to accomplish those thefts also are matters that are inconsistent with a "typical [theft] of its kind.'" United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015).

Lastly, Probation claims that "the defendant had to have engaged in or caused the conduct constituting sophisticated means." Again, this overlooks the aspects of the offense conduct where the Defendant participated in the actual planning, and aspects of the sophistication. While "[t]he sophisticated-means enhancement is appropriate when 'the defendant intentionally engaged in or caused the conduct constituting sophisticated means.' Nothing in this language limits application of the enhancement to only the mastermind of the scheme." United States v. Muresanu, 951 F.3d 833, 840 (7th Cir. 2020) (citation omitted). The Defendant was an able and skilled participant who did not come to this conspiracy with all of its sophisticated aspects prepared and executed by others. For the ATM thefts and burglaries, it is the Defendant who actively executed the well-coordinated thefts, stole multiple vehicles to facilitate those thefts, and undertook concerted energy and time to plan and conceal the crimes. All told, the government has proven that the sophisticated means enhancement should be applied.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   */s/ Philip A. Mallard*
Philip A. Mallard
Assistant United States Attorney

Dated:  March 18, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that Click and choose text from drop-down list filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

_____
Pmallard
Assistant United States Attorney

Date: March 18, 2024