UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 23-cr-10127-LTS |
| SANTO FELIBERTY, | |
| Defendant | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **108 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, and the need for deterrence and just punishment for this type of coordinated theft.  The Defendant has been stealing from others for years.  His criminal record reflects violence, and prior state prison terms for exactly the same types of thefts charged here, with the same coconspirators.  He and his coconspirators have targeted businesses and hardworking residents for well over a decade.  Numerous years of state prison have not deterred him and he continues to take from others. A sentence of 108 months reflects an appropriate punishment for the crimes charged here, adequately considers the career of theft and crime committed by the Defendant, and fully accords with the sentencing factors under Section 3553(a).

**THE ADVISORY SENTENCING GUIDELINES & PSR[1]**

### A.  Offense Level

---

[1] The government refers to the United State Probation Office as "Probation", the Presentence Report by page (PSR p. \_), or paragraph (PSR ¶\_), and references to the docket are by entry number (ECF #\_).  In addition to the content of the PSR, the government submits a report concerning the recent catalytic converter theft activity as Exhibit 1. The victim impact information is summarized from the Victim Questionnaire Spreadsheet is attached as Exhibit 2, and is referenced by the stated Victim number in the spreadsheet (Victim #\_).  Additional victim impact statements are filed with the Court in redacted form as Exhibit 3,4, and 5. The complete victim list was also submitted to Probation and forwarded to the Court in spreadsheet form. The document specifies the date, victim, make/model of vehicle and other details of the thefts (FINAL VICTIM SPREADSHEET – 2023.10.25), and is a basis from which the Court can consider the pattern of repeated targeting of certain businesses, locations, makes and models.

The government disagrees with the offense level calculation provided by Probation, which calculated the offense level in the final Presentence Report to be 21 (PSR ¶¶226-247). The government lodged specific objections to PSR not including the 2-point increase for sophisticated means under USSG § 2B1.1(b)(10)(C), and the 2-point increase for possession of a dangerous weapon under USSG § 2B1.1(b)(16)(B) (ECF #198).[2] The government's substantive arguments regarding its objections to the PSR are set forth in the addendum to the PSR and in a separate filing (ECF# 198).

Consequently, the government takes the position that the Adjusted Offense Level for Group One *should be 28*. Based on this calculation, there would be no consideration of Group Two under the grouping principles as Group Two is 9 or more levels less serious than Group One if the government's objections are sustained (USSG § 3D1.4(c)). Then, acceptance of responsibility furthers reduces the offense level by 3. Therefore, the government believes the <u>Total Offense Level should be 25</u> (PSR ¶¶270-273). With a criminal history score of six, the Defendant's criminal history category is III (PSR ¶¶250-255).

**B. Guidelines Sentence Range ("GSR")**

Under the government's offense level calculation of 25 (as amended from the plea agreement, see fn. 2), and CHC III, the government believes the GSR should be 70-87 months.

In the event that the Court does not agree with the government's offense level calculation and to the extent necessary, the government makes its sentencing recommendation as including a request for an upward variance and/or departure to 108 months based on: (1) the offense level determined under the guidelines substantially understating the seriousness of the offense (USSG §2B1.1, n. 21(A)); (2) the offense causing property damage and impact not accounted for in the guidelines (USSG § 5K2.5); and (3) the criminal history score "under-represents the seriousness of the defendant's criminal history or the

---

[2] Upon further review of relevant caselaw relating to earlier versions of the enhancement under the USSG, the government no longer takes the position (as it did in the plea agreement) that the offense level should be increased by 2 because the case involved receiving stolen property, and the Defendant was in the business of stolen property. <u>See</u> <u>United States v. McMinn</u>, 103 F.3d 216, 222 (1st Cir.1997) ("[A] thief would not qualify for the ITB enhancement if the only goods he distributed were those which he had stolen.").

likelihood that the defendant will commit other crimes." USSG § 4A1.3(a)(1).[3]

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 108 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

The Defendant participated in essentially three separate conspiracies. The first is the catalytic converter theft conspiracy with Rafael DAVILA. The second is the jewelry store burglary with Rafael DAVILA and OYOLA. The third is the ATM theft conspiracy with Rafael DAVILA and OYOLA. Each of these conspiracies netted the Defendant thousands of dollars in profit, and hundreds of thousands of dollars in losses.

### A.      Nature and Circumstances of the Catalytic Converter Conspiracy and Thefts

The Department of Justice prioritized the investigation and prosecution of catalytic converter thefts due to the rising number of thefts across the country.[4] Those cases essentially involved targeting the businesses profiting from the purchase of stolen converters from the thieves and sale of the "cores" to other

---

[3] This would include multiple prior sentences being counted as part of the criminal history (USSG § 4A1.3(2)(A)), and that the "defendant was pending trial" at the time of these offenses (USSG § 4A1.3(2)(D)).

[4] See Department of Justice, Press Release, "Justice Department Announces Takedown of Nationwide Catalytic Converter Theft Ring," November 2, 2022, available at https://www.justice.gov/opa/pr/justice-department-announces-takedown-nationwide-catalytic-converter-theft-ring (press release related to prosecution of DG Auto and related defendants in the Eastern District of California, and Northern District of Oklahoma).

entities. Unlike those other prosecutions, however, Operation Cut & Run investigated the actual thefts, identified the suspects and sought to hold them accountable for the specific thefts that they committed. In so doing, this case is somewhat unique in that the actual thefts were proven and the specific victims' impact would therefore directly factor into the Court's decision-making at sentencing. In short, this entire investigation was predicated upon targeting those who themselves were doing most harm to businesses and residents, and holding them accountable for the frustration, stress and financial costs they imposed on the lives of others.[5]

To be sure, thefts from about 500 vehicles were specifically charged against this conspiracy. However, the Indictment only specified thefts that were supported by at least three salient pieces of evidence tying the thefts to these Defendants, such as: the MAROON ACURA MDX being visible on at least one theft in the area that night; cell site location information showing the Defendants operating in the general area that night; and some form of digital evidence corroborating the activity, such as a note, or text message. Many more were suspected and not able to be sufficiently proven. Even so, this case and the very large number of actual thefts charged against the actual thieves is unique in the country.

### 1. Sophisticated Nature & Repetitive Conduct

The government wishes to be clear: this is no mere property crime. For well over a year, this conspiracy stole hundreds of catalytic converters and made hundreds of thousands of dollars. The crimes demonstrated a honed precision in their execution and expertise in their planning and concealment. These were not crimes of opportunity or desperation, and they were not crimes committed by those who were down on their luck or suffering from some other issue. Far from it – these crimes were the product of concerted effort, discernment, expertise and an overarching goal of seeking as much as profit as possible.

The Defendants targeted vehicles along carefully mapped routes and used tools and implements purchased purposefully for the crimes. They researched the most valuable vehicles to target and spent effort

---

[5] And in so doing, this case revealed that the same large-scale buyers targeted in other prosecutions for the business were profiting from these Defendants actual thefts as well.

doing "homework" to identify where they would be found. The crimes were committed brazenly. They could steal from dozens of vehicles in a single night, systemically striking each truck or van parked at a business, or boldly entering onto a driveway or parking lot to target a resident's personal vehicle parked outside.  For each victim, the Defendants plainly did not care how their slight profit from each vehicle would affect the business or individual. And they did not fear law enforcement. They knew that this was a "property" crime, and they had taken care to conceal themselves and not leave a discernible trail that could tie them to the MAROON ACURA MDX. And all they had to do was cut the lights, and increase their speed on the highway and any chases would be terminated.

The thieves were skilled and well-prepared. The catalytic converter thefts were predicated upon the use of an internet application that provided real-time pricing for catalytic converters quantifying the commodity prices of the amounts of precious metal in a particular vehicle's converter. See PSR ¶¶17-18. Equipped with special knowledge of the values on the black market and technical skill with vehicles, the suspects targeted specific makes and models of vehicles to maximize the profits. PSR ¶¶17-18. They devoted time and energy to locate places and businesses where large numbers of these vehicles were located in order obtain an economy of scale. The thieves would travel hundreds of miles, hours on end in a single night, to specifically target businesses whose fleets were comprised of highly-valued vehicles.

The conspirators used a specific vehicle well-suited to the job that was equipped with anonymous license plates that they believed would not provide an avenue of investigation for law enforcement. They disabled cellular phones and travelled hundreds of miles on most trips in order to spread their crimes across the state and region.  Their tools had sharp blades and fresh batteries. These tools and implements were deployed with skill and the cutter got underneath the vehicle with the reciprocating saw within seconds. For most thefts, it would take less than a minute to remove the converter from the vehicle and move on. They undertook high speed chases to avoid being caught by responding police, if they were seen. And in general, they operated with a sense of impunity that was born of an extremely successful system that had resulted in hundreds of thefts and hundreds of thousands of dollars in profit.

Crimes of this caliber and sophistication committed by dedicated and professional thieves do not

merit leniency or reduced sentences.  The circumstances of these crimes support an aggravation of the offense, and do not, in the government's estimation, afford for much mitigation on the part of the skilled offender. These are not crimes born of necessity, desperation, or addiction. Rather, they are the product of concerted effort, discipline, a considered investment of time and energy, and the application of technical skill. Indeed, the crimes are exacerbated by the cool precision that was employed in their commission over the many months, night after night, vehicle after vehicle, despite law enforcement's best efforts.

The nature and circumstances of these crimes prove the deliberate and considered choice to target and victimize others for personal gain. Because of the thefts, a business would suffer their entire fleet of vans being looted in one night, only to have other vehicles at a different location targeted on a later night. The individual victims were left with little recourse except to cobble together enough money to pay the deductible if it was low enough, and rebuild what was left of their day and week after the inconvenience of losing their vehicle for the foreseeable future.  The Defendants chose to target others and steal from other hardworking members of the community. They made this choice instead of themselves working in a legitimate business or industry and applying their obvious skill and discipline to a positive endeavor. The reason for this choice was obvious: the thousands of dollars in tax-free profits they would make each night. As a result, the nature and circumstances of the thefts require a serious sentence consistent with the government's recommendation.

### 2.  Victim Impact

There are over 300 separate victims in this case. The victims include businesses and individuals from all walks of life and all parts of Massachusetts and some from New Hampshire. They included a food pantry, families, automotive businesses, tradesmen, a bakery, single parents, a home healthcare provider, and the elderly. The conspirators would target your vehicle, steal its converter, and you would have to deal with the vehicle being disabled for potentially weeks on end.

While it may not seem so, this case proves that catalytic converter theft is a profoundly personal crime, even for the businesses who were targeted. The thieves would target a vehicle that is parked in a driveway of a home or parking lot of business. They would need to trespass to gain access to the car, get

under it and cut away the converter. For individuals, there is a significant sense of violation in the theft since their vehicle is usually parked close to where they were sleeping and there is an element of surprise in the morning that this has happened essentially under their nose.  A number of victims have provided specific information to inform the Court about how the loss of their vehicles upended their lives and affected them financially.  Businesses suffered as well. They would see their trucks or vans disabled for weeks on end and then be forced to bear out of pocket costs for repairs and rental vehicles. But that is only their bottom line – the goodwill of the businesses also deteriorated due to these crimes: their customers would be left waiting for deliveries or service calls that could not be made, and workers were forced to make do with their own vehicles or work when other trucks were available.

For some businesses, who were targeted on multiple nights, these crimes also created a sense of impending disaster that they felt in addition to the financial losses. This Court should consider the fear and foreboding that invaded the minds of the business owner or operations manager, who knows that it is only a matter of time before the thefts and disabling of their trucks forces them to endure another round of a multi-week repair cycle and thousands of dollars in costs.  One bakery was targeted on five separate nights at three of its locations and suffered damage to forty-two (42) of its trucks over the year.

For the individual victims, the impact is readily identifiable and understandable. Consider how your life would be affected if in the moments you went to use your car in the morning you learned it was damaged and would be unavailable for few weeks. The simple act of going to work and getting you and your family ready for that day is completely frustrated.  Then consider: the loss of your vehicle for weeks, the stress created in getting things accomplished and meeting obligations both personal and professional, the time that these problems take from you and your family, and the unnecessary stress and costs you have to bear, after already playing by the rules of society in every other respect. In stark contrast to their victims, these Defendant have essentially never played by the rules.

The victim statements expressing these sentiments are be summarized as follows:

- A "medical/life sciences supply company" in Canton, MA reported being targeted on two nights for five vehicles, and suffering $12,114 in costs.  See Victim #1.  They lost the use of their vehicles for over 60 days collectively, but were able to use other vehicles to perform all

the deliveries. This victim reported: it is a "small minority owned company" that is operating in a crowded industry and as such we run on very slim margins." See Exhibit 3. The victim reports:

> From a processing standpoint, at that particular time we were fortunate enough to have enough vehicles to cover deliveries, so impact to us serving our customers was minimal. We did, however, have to take a hit financially to the amount of $12k to offset the cost of repair that insurance didn't cover.

> Not only did this theft have an impact on our bottom line, it also took a bit of a toll on us psychologically. Our trucks were locked up in an area of the property that was lighted, fenced in with barbed wire. This did not deter the thieves from coming in and cutting our vehicle's exhausts into pieces. We shared the video of both events with the Canton police. Basically, we felt helpless!!!! Every Monday I would dread coming into the office and having a driver tell me, 'we got hit again'.

Exhibit 3.

- One individual reported that they "had to share cars with [their] Fiancé and there were several days I was unable to drive to work because of schedule conflicts." See Victim #2.

- An automotive business reported that their customer's truck was targeted, and their business was impacted, and the "theft forced [the business] to reevaluate our policy of leaving our customers vehicles outside our gate" and "[p]revent[ed them] from accommodating our customers['] requests" in the future. See Victim #3. Insurance paid the repair claim, which was nearly $8,000.

- A paving business was forced to pay $8,60 to repair costs but was otherwise unaffected because the truck was a rental. See Victim #4.

- A sheet metal business reported having to pay over $2,500 in a deductible, lost access to its truck for over two weeks, and lost about $10,000 in productivity.  See Victim #5.  The loss of their truck forced their work to be completed on overtime, and made them unable to prepare for future job deliveries.

- Another business had to pay $1,000 in a deductible, off the $7,428 repair claim, and lost the use of their van for two months. See Victim #7.  During this period, the employees had to use their personal vehicles to get to the job sites.

- A food service business was forced to pay $8,200 in repair costs, and lost use of their truck for 21 days during repairs.  See Victim #8.

- A soil company had to pay $3,101 and lost use of their van for over three weeks during repairs. See Victim #9. They reported about 5 to 10 hours in lost time as they dealt with the theft.

- One individual had to pay $798 to repair their Corolla, and lost use of their car for 26 days. See Victim #11. During that time, they had to pay about $5,000 in costs associated with getting groceries and suffered a $96 increase to their insurance premium.

- A kitchen business reported $5,648 in costs to repair their truck, and lost two days of productivity, and three delivery days that they were able to reschedule. See Victim #12.

- A financial service business reported $1,943 in costs to repair the vehicle, and while they did not experience any loss of business or wages, the "theft did affect [them] emotionally." <u>See</u> Victim #13.

- A food pantry was targeted twice and had to pay $2,318 in costs to repair, and lost access to their truck on eight days on each occasion. <u>See</u> Victim #14. The organization has one truck that helps them distribute assistance to 4,351 persons in 2023. The food pantry provided the following information in its victim statement (Exhibit 4):

    > Last year 695,704 pounds of food was distributed to our neighbors at these locations.

    > Another 38,713 pounds of food was sent home with children in partnership with our public school system to ensure that they had food over weekends.

    > Our food rescue program in partnership with Stop & Shop, Shaws, Whole Foods Market and B.J.'s allowed the pantry to collect 215,904 pounds of food, a critical resource we rely on to meet the needs of our neighbors.

    > All these programs were in jeopardy. But thanks to business owners in the community who provided us with use of their trucks when our truck was being repaired, we were able to conduct business as usual and are eternally grateful for their support.

    > Although our insurance company covered a majority of the costs, the out of pocket dollars were $2,318. Our organization raises money through donations, fundraisers as well as grants. We were very grateful to the donations we received to help cover the shortfall.

    > The food pantry is a volunteer based organization, and when word of the theft spread, many were brought to tears and outraged that someone could do this. After the 2nd theft, anger at this being done, not only to the food pantry, but to our neighbors in need, could not be measured. Our truck is a symbol of hope to -residents who are food insecure. We, as a community, felt violated in a way that cannot be quantified. To this day, we are still emotionally impacted by this crime, and wonder how individuals could be so callous as to impact our most vulnerable seniors, families and children.

Exhibit 4.

- One individual from Fitchburg reported being targeted twice, and had to pay a $300 for each claim. <u>See</u> Victim #15. The victim had to use two tows under AAA, and lost access to the vehicle for five days. They suffered the loss of two days of pay, and increases to their insurance premiums. The victim noted the intrusive nature of the theft: "Car was parked in my own driveway at the time" and reported a sense of helplessness from suffering the crime twice, stating that "this is happening so much, not just in my area but everywhere. There needs to be something done to prevent someone from stealing" the converters.

- Another victim in Worcester, MA, had to pay a $1,000 deductible and lost access to their car for two weeks. <u>See</u> Victim #17. They also had to pay for a rental car that cost them $120.

- Another victim in Abington, MA, suffered about $500 in costs due to the deductible, the tow, and gas. <u>See</u> Victim #18. They also lost use of their truck for over a week, had to use a vacation day, and the truck was not repaired to original condition. This victim is a "solo parent without

a car" and "had to ask for rides to work and then borrowed a car" which was much less fuel efficient that added to the costs.

- An insulation business reported having to pay a $1,000 deductible for each of the two trucks that were targeted, and then bore labor and repair costs of $1,200. See Victim 19. That business also had to wait 30 days for their insurance company to pay the claims and by the time the money to repair was received, they lost a few months of use of the trucks.  The business reported that their "[t]wo trucks could not provide services to customers. Jobs were delayed. Workers had no work. Lost income because we could not preform work for clients."  The owners reported stress that was caused because they could go out and get their work done, and they wasted time replacing and repairing the vehicles, and noted the lost revenue and lost wages and work for their employees.

- An electrical company reported having to pay a $1,000 deductible and losing access to their truck for six days.  See Victim #20. They lost use of the "box truck used to deliver material/stock/tools to job sites" which "caused shipment delays, lost time, and delays to job schedules."

- An individual from Framingham, MA, reported that they had to pay a $500 deductible, but was able to get the repairs completed the same down. See Victim #21. The victim only had to lose a morning of work, but it was a "total inconvenience" because they work for an "hourly wage." The victim did note that it caused them "much stress and anxiety" regarding the "safety" of their family at home, and caused them to spend another $500 in a quality security camera system.

- A home health care company reported having to pay about $6,000 in costs for rental vehicles. See Victim #22.

- An individual from Framingham, MA reported that they paid a $500 deductible of a $3,000 claim and lost their vehicle for about a week of repairs. See Victim #23.  The victim also "[l]ost a day of work because of dealing with insurance, car rental, AAA, and repair shop."

- A victim from Shrewsbury, MA, reported that they paid $2,318 in costs, and lost a day of work and their son did not go to school. See Victim #24.  This victim also reported that they suffered a "very strong financial and psychological shock from which I still cannot recover." Specifically, the victim had "great difficulty" in purchasing a car, and then about "two months later I had to pay another half of [the] cost of this car for repairs."

- A kitchen design company reported that they paid a $500 deductible and lost use of their truck for about 9 days. See Victim #25.  The business reported that "Each business day without a truck cost my company approximately $1000 per day related to lost business opportunities (product deliveries)." Aside from the business's bottom line, this also affected their customers as well. As the victim reported: "Each business day without a truck resulted in customers complaining that we could not deliver their materials. (We delivery critical building materials to homes undergoing kitchen renovations-delivery delays mean customers are without working kitchens.)"

- A sports company suffered $500 costs for the deductible off a total repair claim of $6,500. See Victim 26. They lost the use of the work van for over a month during repairs, and this negatively affected their marketing because the van carries the business information on it.

- An individual in Abington, MA reported that they paid a $500 deductible off a $1,784 repair bill. <u>See</u> Victim #28. They lost the use of the vehicle for repairs, and lost about one and a half-days of work because they were unable to work without their vehicle.  This victim commented on the nature of the intrusion and believed "the theft was well planned and executed. The parking spaces are directly in front of our townhomes."

- An individual in Easthampton, MA reported having to pay a $1,000 deductible and $281 for a tow. <u>See</u> Victim #30. The victim lost the use of their car for three weeks and rented a car for a week. The victim is "disabled and it really put me off the edge. I was so upset, I couldn't go up and babysit my grandkids in Russell.so that I was really put out on that."

- A business in the construction company who had seven vehicles targeted reported that they spent over $7,770 on temporary fixes to their trucks and anti-theft devices.  As that business reported:

  > The theft of the catalytic converters on 7 of our vehicles left us with the inability to utilize these 7 trucks and placed a significant strain on the remainder of our fleet, drivers, and warehouse staff. We value our commitment of Next Day delivery to our customers and this theft hindered our ability to meet our commitments.

  > Due to the rampant theft of catalytic converters in our region; we were unable to source new parts for some time and were left with no option but to place temporary fixes on these trucks. We contracted with a local welder who was able to install a temporary fix so that we could get these trucks back on the road. This temporary repair took 5 days to complete on these trucks which again; significantly hindered our ability to deliver product to our customers. This temporary fix alone cost us $2,200.00.

  > Although the cost of replacements and repairs is significant, the impact that actions had on our staff was far greater. The stresses of having to reschedule deliveries, move deliveries to other available vehicles, and all whilst ensuring our customers receive the same level of service that they would receive on any other given day. Our day to day is fast-paced yet extremely efficient and the stress of having our fleet impacted in this manner is one that we hope to never have to deal with again. To ensure that we do not have to face this ordeal in the future, we took the extreme measure of placing anti-theft devices in all of our fleet vehicles. The cost associated with these anti-theft devices was over $5500, in 2022. And this is something we continue to add to any new fleet vehicle we purchase.

  > As stated above, the actions of had a great impact on our business. We incurred financial and delivery burdens as well as stress amongst our staff. And I can assure you that our Automobile policy premiums have been significantly impacted as well due to this incident. [The Defendants] should be held accountable for the crimes he has committed and our region should be able to feel safe against this happening again in the future.

Exhibit 5.

The nature of these crimes targeted others and had serious impacts on the victims' lives. While the impact is not measured in physical injuries, there were emotional injuries, practical difficulties, frustration and stress that the crimes imposed, and also the very significant financial setbacks that the victims suffered.

There is a measure of just punishment that must be reflected in the sentence when, as here, the Defendants target others and steal the time and peace of mind from the lives of so many.  The government asks the Court to impose the requested 108 months, which properly reflects the Defendant's role and participation in stealing from others, negatively affecting the lives of dozens of individuals and businesses financially and emotionally and profiting in the process.

### 3.   Statistical Impact Following Arrests

The impact of the investigation and dismantling of this theft crew also cannot be overstated. And it should be directly considered by this Court in terms of the nature and circumstances of crime.  Since the day of the coordinated takedown and arrests on April 12, 2023, to the days prior to the filing of this memorandum, there have been only seven (7) catalytic converter thefts reported to Mass Crime Net.[6]  See Exhibit 1.  By comparison, during the period of July 2022, through April 12, 2023, there were 258 catalytic converter theft incidents reported to Mass Crime Net and NESPIN (each incident generally comprised of multiple thefts taking place in a single city/town on a single night).  The substance of this decline is also borne out by the dearth of media reports concerning catalytic converter thefts in Massachusetts since the arrests as well.

While this conspiracy was probably not responsible for every catalytic converter theft reported to Mass Crime Net during the period of July 2022, through April 12, 2023, the nearly complete cessation of catalytic converter theft in Massachusetts speaks to how prolific these conspirators were, and how this conspiracy largely drove those numbers.  This decline also speaks to the success shared by the over-70 local police departments in Massachusetts and New Hampshire, Massachusetts State Police and FBI in turning the tide of this type of crime. In short, Massachusetts is no longer open for business to catalytic converter thieves, and the residents and businesses of this state no longer need to fear the loss of their catalytic

---

[6] Mass Crime Net is an information sharing platform hosted by the Massachusetts State Police. In this investigation, Mass Crime Net served as a coordinating entity and clearing house for catalytic converter theft incidents throughout the region. Apart from this investigation, Mass Crime Net receives reports of property crime and other incidents of regional note in order to facilitate information sharing, coordination among agencies, and promote officer awareness and public safety.

converters.

These Defendants were essentially professional catalytic converter thieves, with a dedicated fence and ready access to the larger marketplace.  The removal of these five cutters and their dedicated fence, the aggressive prosecution by other components of DOJ of national entities responsible for buying stolen converters up the chain, and the passage of recent legislation in Massachusetts, have all combined to essentially end catalytic converter theft in the state of Massachusetts.  This astonishing statistical drop-off should give this Court insight into the nature and circumstances of this organized and sophisticated conspiracy, and how the crimes that they committed play into the larger landscape of catalytic converter thefts in this District.  In short, these charged Defendants played an outsized role in this category of crime.

The government suggests that a sentence of 108 months sends a very serious and appropriate deterrent message.  Stealing from others and participation in a conspiracy of this nature for even a limited period will merit a lengthy sentence that will separate you from society for considerable period of time.  This is type of general deterrent message is all the more important for this Defendant who has a criminal record with multiple prior state prison terms and has committed other types of theft during the same time period netting him hundreds of thousands of dollars.

### 4.   Catalytic Converter Thefts Committed by this Defendant

This Defendant, Santo Feliberty is responsible for six nights of catalytic converter thefts taking place between December 2022 and April 2023.  See PSR ¶¶75a, 76a, 76c, 83g-83l, 83t-83z.  These nights of theft account for 52 vehicles.  See PSR ¶214. The Defendant committed all of these thefts with Rafael DAVILA.  The Defendant describes himself a "self-taught mechanic" and this skillset served him well in the theft of the catalytic converters.

The first night of theft on December 21, 2022, resulted in an armed confrontation with a vehicle owner who was not going to acquiesce to his catalytic converter being taken. That victim took matters into his own hands and smashed out the rear window of the Maroon ACURA MDX. The vehicle traveled at very high speeds back from New Hampshire all the way to the Defendant's residence, where it remained parked in front of his garage. They remained undeterred.  The Defendant and Rafael DAVILA would

continue on committing thefts on January 5, 2023, January 9, 2023, and January 26, 2023, stealing 34 catalytic converters on these three nights.

Separate from the charged conspiracy, though indicative of his ongoing crimes, The Defendant was arrested on March 17, 2023, in Canton, CT. See Exhibit 8 (Canton Police Report).[7] During this incident, police observed the Defendant and another individual dressed in all black hiding in and amongst vehicles at a car dealership. The officer approached them in his cruiser, got out, and began chasing the two men on foot. While running from the officer, the Defendant and the other man split up. The officer apprehended the Defendant when he reached a fence. He was dressed for the job: black winter ski mask, black hoodie, black pants, black shoes, and black rubber coated gloves – a knife was also found along his path of flight. The Defendant was charged in Hartford, CT Superior Court, and released on conditions and a cash bond. Two weeks later, he would commit catalytic converter thefts with Rafael DAVILA on April 4, 2023, and April 11, 2023, stealing a total of 17 more converters over these two nights.

### B.  Jewelry Store Burglaries, ATM Thefts and Other Crimes

The Defendant's other crimes are best considered in their timeline.

#### 1.  February 2022, Rim Theft

First, in February 2022, the Defendant conducted a burglary of a vehicle transportation company and stole the tires and rims from a luxury Ford truck. The Defendant left the truck on cinder blocks without the tires and rims, and broke the rear window in order to steal the paperwork and the lock key. The truck was targeted while in the custody of a vehicle transportation company and that company had to bear the costs of the theft and insurance deductible. A few months later, the victim who was paid to transport the luxury truck was at Chipotle when he observed the Defendant driving his own luxury Dodge truck that appeared to have the same tires and rims that were stolen from the Ford. The Defendant claimed to have

---

[7] See USSG §4A1.3(a)(2)(D) (grounds for upward departure based on "Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense."); see also USSG §4A1.3, comment. (n.2(A)(iv)) (listing, as an example, a case in which the defendant committed the instant offense "while on bail or pretrial release for another serious offense").

bought them from a third party and that he would provide the information about the sale. These were lies – the Defendant stole the rims and took them for himself, simply because he wanted them. The Defendant ended up sending the victim the same paperwork that he stole from the Ford truck when he burglarized it. This is a brazen incident that reveals considerable insight into the Defendant's opportunistic attitude towards other people's property. He simply does not respect anything and is willing to take what he wants, and lie repeatedly to ensure he does not face any consequences. These stolen tires and rims would later be found on the Defendant's truck that was seized during the takedown in this case.

### 2. ATM Thefts & Trailer Theft

The next set of crimes committed by the Defendant are the three ATM thefts. They successfully targeted one ATM stealing $21,809, failed to get the ATM onto the truck during a second incident, and cased a third location that they did not target.

#### a. 12/8/2022, Tyngsborough, MA

The first ATM committed by the Defendant, Rafael DAVILA and OYOLA was an Enterprise Bank ATM in Tyngsborough, MA. To commit this theft, they used a stolen truck that they stole from South Windsor, CT. They drove the stolen truck to Tyngsborough, MA and used hooked chains to pull the ATM out of the ground. They loaded the ATM on the truck within seconds, and fled from responding police into New Hampshire with their lights off. The ATM itself would be recovered in Hudson, NH, and the stolen truck recovered in Windham, NH. All told, they made off with $21,809 in cash from the ATM, and caused over $15,000 in damages. Because the truck was dumped in New Hampshire, the Defendants clearly had to have utilized a second vehicle during the incident, either stashed in New Hampshire in anticipation of the theft, or another follow car. This second vehicle was never identified.

The CSLI for the Defendants' phones tell the tale. The Defendant's personal phone was conspicuously off the network from 10:31 PM to 7:27 AM. The Defendant's burner phone showed activity in South Windsor, CT and Tyngsborough, MA. This was a well-coordinated theft taking place at the border. The crime and its preparation and aftermath spanned three jurisdictions and involved at least one stolen vehicle, and at least one additional vehicle that was either staged in New Hampshire to facilitate the return

trip after dumping the stolen car or serving in a dedicated role as a follow car. They had to prepare and bring chains and hooks to dislodge and steal the ATM. Additionally, they had to prepare and bring the tools necessary to break-open the ATM's vault, and bring those tools with them as they cracked open the vault in New Hampshire after running from police.  To give a sense of distance, the distance from Springfield, MA to South Windsor, CT, to Tyngsborough, MA, to Hudson, NH, to Windham, NH, and back to Springfield, MA is 260 miles.

**b.   12/13/2022 Lowell 5 Bank**

The Defendant, Rafael DAVILA and OYOLA, cased a Lowell 5 Bank ATM in Chelmsford, MA, on December 13, 2022.  They discussed the theft in text message and then travelled 180 miles simply to get a sense of its whereabouts and determine whether it would be a viable target to hit.  Once there, they got out of the vehicle, walked around the ATM, and took photographs of it. Those photographs taken by the crew would be recovered for R. DAVILA's cell phone. Similarly, the ATM surveillance camera captured them approaching it, and walking around it and photographing it.  Ultimately, this ATM was not targeted.

**c.   12/14/2022 Trailer, Grill and Snowblower Theft**

On December 14, 2022, the very next night, the Defendant, Rafael DAVILA and OYOLA committed another string of thefts.  This evening started with the theft of a trailer from Hooksett, NH (PSR 170-186).  The stolen trailer would be recovered at Rafael DAVILA's storage unit on April 12, 2023 (PSR 207).  It was valued at approximately $10,000 and the victim was only paid $8,300 for the claim.

The same night as the trailer theft, the Defendant, Rafael DAVILA and OYOLA also committed the theft of seven snowblowers from a hardware store in Acton, MA. It appears that they cut the snowblowers from their locked cable, and utilized the stolen trailer to transport them. The Defendant, Rafael DAVILA and OYOLA exchanged text messages about the cash split from the proceeds of the snowblowers, and DAVILA took photographs of them.  Some of the snowblowers would be recovered from Rafael DAVILA's storage unit and Nicolas DAVILA's residence (PSR 207).  The snowblowers were valued at $8,648.  This total evening involved over 270 miles of travel to commit the thefts and return back to

Springfield, MA

### d.   12/15/2022 Chase Bank

On the following evening, December 15, 2022, the Defendant, Rafael DAVILA and OYOLA attempted to commit another ATM theft (PSR 132-144). Like before, this theft involved a stolen truck. Stolen license plates were affixed to the truck and DAVILA's Dodge Challenger. These license plates were themselves stolen back in November 2022 from Andover, MA.  The theft was skillfully executed as before. This time one of the thieves (believed to be FELIBERTY) used spray paint to cover the camera on the ATM. Then, from 3:10 AM to 3:13 AM, they dislodge the ATM, lift it up and determine that they cannot access the interior. They speed off at 3:14 AM and are gone before the police arrive at 3:16 AM. While no money was taken, they caused $65,000 in damage.

Shortly thereafter, DAVILA's Dodge Challenger is seen by Maynard Police following the truck. Police attempt to stop the Challenger, and DAVILA takes off at a high rate of speed, exceeding 90 mph and evading the officer. The Defendant's personal phone was conspicuously off the network during the incident. The Defendant's burner phone showed activity in Concord, MA and Maynard, MA at the time of the thefts.

### 3.   1/12/23 Jewelry Store Thefts

The jewelry store burglaries are particularly indicative of the skill and coordination of this crew of thieves (PSR ¶¶145-169).  On January 12, 2023, they successfully targeted two jewelry stores on the same night and conducted a distraction break-in to draw the police response. They entered each store and conducted the thefts with precision and a discernible timetable of leaving within two minutes.  In total, they stole over $137,000 in jewelry within minutes, and caused about $20,000 in damage.  In order to ensure they were successful, the Defendants scouted the jewelry stores the night before, travelling well over 240 miles. During the break-ins, they utilized a stolen Hyundai Sante Fe. They had stolen this vehicle on January 10, 2023, when they went to scout the locations, and stashed the vehicle in the area nearby the stores for later use.

All told, this Court can ascertain the relentless nature of the Defendant's crimes. Even in the face of armed confrontation by a victim, high-speed pursuits by the police, and arrest on similar charges, the

Defendant simply refused to stop committing crimes.  In fact, the Defendants were more than capable of outrunning police by using high-powered vehicles, and undertaking extra steps to steal cars and license plates to ensure they could not be readily tied to the thefts.  They employed jurisdictional borders and the geographic distance to insulate themselves from scrutiny, and would routinely travel hundreds of miles to their crimes.  Most significantly, these Defendants were not caught in the act due to their skill in executing the crimes and evading police. It required a concerted efforts of over 70 police forces and high-end investigative techniques to unravel the web of crimes committed by the Defendant.

### C.      History and Characteristics of the Defendant

The Defendant has been sentenced to a total of 16 years in state prison in Connecticut for jewelry store burglaries on two cases. A prior sentence in 2010 resulted in a three-year prison term, but does not score due to the fact that the Defendant only served 90 days of that sentence.[8]

The Defendant's criminal history began in July 2008, when the Defendant was charged with OYOLA and DAVILA in a series of car beak-ins where property was stolen from vehicles. The Defendant was placed on pretrial probation for this case until February 2010 and ordered to pay restitution as part of a diversionary sentence.  See Exhibit 6; PSR 258.  The Defendant was then convicted of participating in the two jewelry store burglaries that bear a marked similarity to the two burglaries he is charged with here. See PSR 252, 253.

In addition to the convictions, the Defendant was implicated in the robbery for which OYOLA was charged and convicted.[9]  On January 13, 2010, OYOLA was arrested for a serious jewelry store robbery in Fairfield, Connecticut that involved four suspects who stole forty-two watches. See Exhibit 7.  During the robbery, one of the suspects stated "don't move or I'll kill you." A vehicle driven by OYOLA was located and appeared to be involved as a "crash car" or vehicle that would be utilized to block police pursuit. Police

---

[8] See USSG §4A1.3(a)(2)(E) (grounds for upward departure based on "Prior sentence(s) not used in computing the criminal history category.")

[9] See USSG §4A1.3(a)(2)(E) (grounds for upward departure based on "Prior similar adult criminal conduct not resulting in a criminal conviction.)

stopped the vehicle driven by OYOLA, and found numerous items and documents related to an organized theft crew, including a printout of Connecticut jewelry stores that listed the store that had been robbed, and a ski mask. During the stop, OYOLA received numerous calls from Santo FELIBERTY, and a second phone belonging to FELIBERTY was also recovered. Investigators obtained FELIBERTY's cell site location information, which showed he was in the vicinity of the jewelry store during this robbery.

### 1.  Criminal History

Despite multiple prior state prison terms for jewelry store burglaries that were committed with the same coconspirators, and a prior case where he literally ran over a police officer multiple times, the Defendant is only criminal history category III.  The government contends that this score significantly underrepresents his criminal history as the state prison term associated with the assault of the police officer does not score due to the 3 years not being served.  See PSR 250. Incidentally, it was this felony conviction that led to the Defendant's DNA being entered into the system and the DNA matching to the two burglaries that resulted in state prison sentences (PSR 252-253).  Due to the leniency he received in those cases, it appears that he only served a few years of those sentences.

In the context of the crimes charged in this case, this criminal history reflects a considered decision to engage in crime. The Defendant simply understands that the thefts can be committed successfully with little potential of arrest if certain efforts are undertaken to defeat traditional avenues of investigation.  Given the potentially significant proceeds, and lenient suspended sentences he has received, the Defendant's criminal history demonstrates that crime indeed does pay.  At least until now.

Moreover, it is important to note that the Defendant's historical convictions are only the product of something going wrong during the crimes. Clearly, the Defendant made a mistake during the two burglaries that led to his DNA being left behind. The Defendant also certainly made a mistake when his car was stopped and he struck the police officer multiple times. And OYOLA served 8 years for ineffectually driving the lookout vehicle during the robbery.

In contrast to that period, the Defendant has now learned from those mistakes and simply is a better criminal. He committed no error in the catalytic converter thefts, the ATM thefts, or jewelry store burglaries.

If not for the larger federal investigation into the catalytic converter thefts that led to his coconspirator, RAFAEL DAVILA, being aggressively investigated, the Defendant's burglary and thefts crimes would have otherwise gone unsolved.  And that is a salient aspect of the Defendant's criminal history: he has grown in his criminal practices and is less prone to errors that might lead to an arrest.

In short, the Defendant's criminal history bespeaks a criminal who has honed his craft. The Defendant has weighed the prospect of prison against the potential to steal tens of thousands of dollars in cash and jewelry in a single night. Clearly, the Defendant continues to choose crime, and will continue to choose crime unless he is met with a serious sanction in this case. Two eight-year prison terms did not dissuade him from returning to a life of crime.

### 2. Work History and Skillset

The Defendant's work history also tells a story of an individual who simply has been committing thefts for over the past decade. He certainly has not engaged in gainful employment or dedicated himself to do anything since his probation end in 2018.[10]  The Defendant's wife also describes the Defendant owning his own business, but the Defendant himself acknowledges made very little money.  Given the costs of renovations and the demand for skilled labor, the Defendant's claim of earning $24,000 in total income per year could not equate to anything more than a few very small jobs, and is an income that is well below the poverty line.[11]

By comparison, the Defendant could earn more than $20,000 per night stealing from ATMs and jewelry stores, and $4,000 to $5,000 per night stealing catalytic converters.  Indeed, even using the four-month window from December 2022 through April 2023, given the numerous week-day nights of theft and preplanning trips that stretched well into the morning, there would be very few days for the Defendant to do much else.  Consequently, it is quite obvious that the Defendant's income is derived almost entirely from

---

[10] Moreover, the government would suggest that there is a conspicuous correlation between his employment from 2016 and the likely court-imposed obligation of working while on probation. Once probation ended, so too did the Defendant's job.

[11] See Home Guide, Average cost to remodel & renovate a house, available at https://homeguide.com/costs/house-remodeling-cost.

theft.

As the Defendant's wife made clear in the PSR, the Defendant was "a stay-at-home father" and handled school pickup and drop-offs.[12] It seems that the Defendant's family reaped the benefits from his crimes taking place at night, which permitted him to stay home with his children during the day. Indeed, the PSR shows that the Defendant has thrived as a result of these thefts. He has purchased a luxury automobile (a 2018 Mercedes GLC) and owns a home. He also had a luxury truck 2019 Dodge Ram that he equipped with tires and rims that he stole.

Despite legitimate skills and opportunities, the Defendant has chosen to use his skill and talents to conduct brazen, well-coordinated and sophisticated – indeed, opportunistic – thefts at every turn. The Defendant has chosen to destroy the businesses and livelihood of others, while neglecting what opportunities he had to use his talents and education for positive endeavors. The Defendant's catalytic converter crimes added significant stress the daily lives of dozens of families and took money from their households. By comparison, he did will from the difficulties he caused other people who worked for a living. These crimes padded his own pockets and granted him luxury automobiles and leisure time with his children, all at the expense of those who were planning to get up and work legitimate jobs.

In sum, the Defendant's work history and personal characteristic support the government's argument that these crimes were the product of the Defendant specifically choosing to harm others for his own gain, and choosing to take from others, rather than engaging in lucrative legitimate work. It is the Defendant's capacity to do other legitimate work that would pay well and the Defendant's conscious decision to hurt others despite these other options and opportunities that truly compounds and aggravates these crimes. Indeed, these considerations are also an aspect of the offense that are not accounted-for by the guidelines and suggest the necessity of an upward variant sentence to 108 months.

---

[12] The PSR appears to be inconsistent as the Defendant's wife notes that the Defendant did school pick up and drop offs during the first year of his son's life. As there would not be pickups or drop-offs until preschool or kindergarten for their six-year-old son, it would seem that the wife is actually referring to a more recent time period, consistent with the Defendant's thefts here. Nevertheless, the wife's statements support the government's position that the Defendant essentially has never had legitimate employment.

### 3. Specific Deterrence

Specific deterrence is an incredibly important consideration as the Court weighs the length of the Defendant's fourth prison term. These were not crimes born of desperation, or addiction, or even the Defendant falling upon hard times. Indeed, the Defendant seems to have had all the foundational support that one could ask for: a supportive wife and children, a home, and licensure in a skilled trade. There is no explanation for the Defendant's career of crimes except greed and the fact that the Defendant knew there was little chance to be caught and comparatively little penalty if convicted. The Defendant also knew firsthand that there was great economic gain for himself if the crimes were successful.

The Defendant's decision-making is best exemplified by the circumstances right before the arrests in this case. Remarkably, the Defendant was arrested in March 2023 for being in a car dealership in Connecticut, clad in all black and armed with a knife. See Exhibit 8. This arrest was entirely unrelated to the larger federal investigation and appears to suggest that he was engaged in other thefts with other suspects while also committing crimes separately with R. DAVILA and OYOLA.

Given the Defendant's criminal history and who he has proven himself to be, he obviously was intending to steal vehicles or catalytic converters from those automobiles as well. While the Defendant was apprehended by local police, the other man chased by police was not. There was little remorse or acceptance of responsibility as he refused to provide any information about his coconspirators. Despite being released for this pending case in Connecticut and subject to bail conditions, the Defendant was undeterred. In fact, he recommitted to his life of crime and would go on to commit two more nights of catalytic converter theft with Rafael DAVILA, racking up more than a dozen catalytic converters.

The Defendant's trajectory is one in which past leniency was exploited and opportunities to reorient his life were squandered. Those sentencing decisions in past cases did little in terms of curtailing the Defendant's behavior, and the results were many more victims of the Defendant – and they can be measured by this Court in terms of the 52 catalytic converter theft victims, the jewelry store owners, the banks whose ATMs were plundered or destroyed, and the persons whose vehicles were stolen or damaged to facilitate those crimes. Had he been specifically deterred by his past sentences, he may not have found himself in

these circumstances. Consequently, specific deterrence now, for this wave of offenses, is all the more important.

This type of crime has marked the Defendant's life since a young man.  He has been loudly proclaiming his life of crime for years and it is time that the criminal justice system take heed to what the Defendant has loudly been saying about himself.  Specific deterrence must be achieved through the sentence in this case. That deterrence must send a message that will shift this Defendant's thought processes and make clear that further crimes will not be tolerated, and will be met by significant and severe penalties.

From this, the Court can see the need to advance the goals of specific deterrence through an incarcerated sentence of 108 months. This is but one-year more than the two eight-year sentences that he received in 2013 and 2014.  See PSR 252, 253. And those two cases pertained to two jewelry store burglaries that resulted in about $40,000 and $50,000 in losses for each theft.  This case is exponentially more serious in terms of loss amount and number of incidents.  The charges in this case pertain two jewelry stores, three ATMs, 52 vehicles, a trailer, snowblowers, rims, and an illegally possessed firearm taking place over four months, totaling over $550,000 in documented losses. In comparison to the 8-year sentences he received for one-off burglaries in 2014, the government's recommendation of 9 years is a considerable bulk-discount for the Defendant's crime-wave.

Similarly, just punishment must also entail consideration of the sophisticated, coordinated and prolific number of thefts committed by a professional crew of thieves conducting a short-lived reunion tour of vehicles, banks and jewelry stores in the New England area.  The government requests this Court impose a sentence of nearly a decade that will justly punishes the Defendant and reflect the seriousness of his crimes. Just punishment, however, must be cognizant of the fact that this Defendant has proven he will not be deterred, except by incarceration. In sum, a sentence of 108 months properly reflects the Defendant's wayward criminal history, will specifically deter him in a manner that lesser terms have failed to in the past, and will justly punish him for the dozens of victims he harmed in this case.

### D.      General Deterrence, Promotion of Respect for the Law, and Public Protection

General deterrence and promotion of respect for the law must also be considered, and this Court

should be extremely mindful of the message that the sentence will send to other catalytic converter thieves, and those who might be tempted by the potential for quick money through other thefts.  Additionally, other burglary and theft crews must be informed that thefts of this nature from businesses, banks and individuals will be met with a significant punishment and that such crimes simply are not worth the time and effort to undertake.  To that end, this Court must ensure that a message of general deterrence will be sent by the sentences imposed in this case.

It is clear from the statistical decline described above that other professional criminals and catalytic converter thieves are watching this case.  This Defendant and the overall catalytic converter conspiracy are well known to other offenders, and the case made national news.  Fortunately, they have taken the suggestion to stay away from Massachusetts as they anticipate the state, local and federal response to such crimes will be overwhelming.  They are correct.  However, true deterrence and respect for the law are not messages that are sent through an extensive investigation, the shock of arrests and pretrial detention.  These are but temporary measures.

Rather, the understanding of the type of sentence and penalty that one can expect for these crimes is the heart of deterrence and must be a component of this Court's sentence.  See Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").  Moreover, general deterrence and its impact should weigh heavily in this case, where the sentence will be imposed in the only catalytic converter case brought in this District.  The same is true for the burglary and bank theft crimes – this Defendant and R. DAVILA will set the standard for what deterrence means in these types of crimes as well.  Without other comparable cases, or a mandatory sentencing structure determined by Congress, there is no other prevailing sense that might otherwise inform criminals about the penalties for such crimes except the sentence actually imposed by the Court. Therefore, there is an unusual significance and need for this Court's sentence to reflect a message of general deterrence.  The government believes that the sentences in this case will serve as an example and

warning to others, or, alternatively, an invitation.

In the government's estimation, a very strong message of general deterrence is sent by a 108-month sentence for a Defendant facing his fourth prison sentence and who has two prior state prison terms for similar crimes.  Other criminals will understand that theft of catalytic converters and burglaries will find them arrested and in Court, potentially facing a federal case, and potentially a decade in a federal prison if they are repeat offenders.  They will understand that stealing from others on this scale is extremely serious, and will not be met with leniency or disinterest – certainly not by law enforcement and not by the Court.  While a lengthy sentence may not prevent all forms of catalytic converter theft from returning, or deter others from targeting jewelry stores or ATMs, a 108-month sentence will ensure that the gains made by law enforcement do not quickly erode once the results of this case are known.

This sentence of 108-months for a career criminal will also undoubtedly protect the public from the continued theft and potential for other crimes posed by the Defendant.  While incarcerated, there will be no more thefts and losses suffered from the Defendant's crimes, and there will be no more 100 mph car chases with this organized theft crew endangering the public.  This is a sentence that will remove him from society and justly punish him for the wave of thefts he has committed, and the firearm he is responsible for.  A sentence of 108-months imprisonment will also be the best means for the Court can protect the public generally and ensure that their vehicles, businesses, and property will not be targeted for the foreseeable future.  In short, public protection will be well-served by the government's recommendation – it will be accomplished through the Defendant's incarceration and preventing him from committing these crimes in for the foreseeable future, and public protection will be furthered by the general deterrence that results.

Lastly, the swiftly imposed 108-month sentence -- given the Defendant's prompt acceptance of responsibility, and willingness to plead guilty without any litigation -- certainly promotes respect for the law.  Such a sentence will also promote respect for the law among those victimized by these crimes and will let the public know that the law and Court will not excuse hurting dozens of victims in this manner.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 108 months, followed by three years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney

By:      */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   March 19, 2024