**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Docket No. 23-10127-LTS**

**UNITED STATES OF AMERICA**

**v.**

**SANTO FELIBERTY**

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**MOTION FOR CRIMINAL HISTORY DEPARTURE**

Now comes the Defendant, Santo Feliberty, and recommends that the Court sentence him to the low end of the applicable Sentencing Guidelines as determined by the Court.

Mr. Feliberty's Guidelines were accurately calculated by Probation at Total Offense Level [TOL] 21 and Criminal History Category [CHC] III, establishing a non-binding sentencing range of 46 to 57 months.  Mr. Feliberty has moved for a Criminal History [CH] departure to CHC II.  If the motion is allowed, his Guidelines will be TOL 21 and CHC II, establishing a non-binding sentencing range of 41 to 51 months.  Accordingly, depending upon whether the Court grants Mr. Feliberty's CH departure motion, he should be sentenced to 41 or 46 months.

Mr. Feliberty is a 34 year old husband to Alisa Ruperto Feliberty.  (PSR, ¶ 264)  He is the father of their six year old son and three year old daughter.  (Id.)  Additionally, Mr. Feliberty is stepfather to Alisa's 15 year old son from a previous relationship.  (Id.)  Mr. Feliberty lives with his

family at 381-383 Parker Street, Springfield, MA  01129.  The property where Mr. Feliberty's lives with his family consists of their home and a rental unit plus a detached garage.  (PSR, ¶¶ 198 and 199)

Mr. Feliberty has a criminal record from offenses which occurred in 2009 and 2010.  (PSR, ¶¶ 250-253)  Mr. Feliberty has suffered from PTSD since he was the victim of a drive-by shooting (he was not the intended target) in 2006.  (PSR, ¶ 269)

As will be explained more fully below, depending upon the Court's view regarding Mr. Feliberty's CH, either 41 months or 46 months is a reasonable sentence that is "sufficient, but not greater than necessary," to comply with the "the basic aims of sentencing ..."  Rita v. United States, 551 U.S. 338, 347-48 (2007).

**Mr. Feliberty's Criminal Conduct.**

Mainly, Mr. Feliberty was part of a group of individuals, led by Rafael Davila, who stole catalytic converters from vehicles for the precious metals contained in the catalytic converters' cores.  Davila did most of the planing and procured the necessary tools to perform the thefts.  Mr. Feliberty and others were "cutters".  They would cut catalytic converters from parked vehicles.  The catalytic converters were sold by Davila to Jose Torres.  Torres sold Davila's catalytic converters, and catalytic converters stolen by others, to dealers in Connecticut,

Rhode Island, New York and New Jersey.  The dealers removed the precious metals from the catalytic converters and sold the precious metals.

The victims of the thefts had to replace the stolen catalytic converters to operate their vehicles.  The average cost to replace and repair a vehicle from which a catalytic converter was stolen was $5,000.

In addition to stealing catalytic converters, Mr. Feliberty with Davila and Alex Oyola committed burglaries of jewelry stores, snow blowers, motor vehicles, trailers and, on two occasions, ATM machines.  In total, Mr. Feliberty is responsible for losses totaling $554,064.96.[1]  (PSR, § 227)

Finally, Mr. Feliberty, who had prior felony convictions, was storing ammunition in a basement closet of his home, in violation of 18 U.S.C. §922(g)(1).  (PSR, ¶ 201)  The ammunition belonged to a former tenant; a man named Javon Gilkes who died in

---

[1]   But see PSR, §§ 188, 220 and 227.  The total loss, pursuant to Probation's calculations, may be $543,053.96.  Probation included in the total loss an amount of $15,200 for wheels stolen from a truck in Palmer, MA on February 10-11, 2022.  It's likely that the loss attributable to that theft was closer to $4,109.00. The owner of the truck told law enforcement that he paid $15,120 for a package which included "high-end wheels and tires as well as a lift kit and other modifications."  The owner replaced the wheels and tires Mr. Feliberty stole for $4,109.00.

Regardless, pursuant to the terms of his Plea Agreement, Mr. Feliberty is admitting that he is responsible for a loss amount greater than $550,000.

a September 2021 car accident.  (Ex. 1)  Mr. Feliberty was holding the ammunition in a steel box for Mr. Gilkes's family, who live in Virginia and planned to come to Massachusetts and retrieve property which belonged to Mr. Gilkes.

On April 12, 2023, an unloaded 9 mm handgun in a case, which Mr. Feliberty believes belonged to Javon Gilkes, was discovered on a elevated shelf in the detached garage at Mr. Feliberty's Springfield, MA residence.  According to the prosecutor in a 9/29/2003 email to defense counsel, the gun was in the garage up on the shelf or ledge.  Also in the garage, which was quite cluttered, was a car and some other items which belonged to Mr. Gilkes.  Most of the ammunition seized from Mr. Feliberty's basement (500 of the 900 rounds) were .22 caliber ammunition for a long rifle and not suitable for the firearm which was discovered in the garage.  (PSR, ¶ 201)  There were 256 rounds of 9 mm ammunition, suitable for the seized firearm.  (Id.)

**Calculating Mr. Feliberty's Federal Sentencing Guidelines.**

Probation accurately calculated Mr. Feliberty's Federal Sentencing Guidelines at TOL 21 and CHC III.  The sentencing range for those Guidelines is 46 to 57 Months.

**The TOL.**

Probation calculated Mr. Feliberty's Offense Level by starting with the Base Offense Level [BOL] of 6 (PSR, ¶ 226) and assessed the following values for specific offense

4

characteristics:

> +14 for a loss greater than $550,000.  (PSR, ¶ 227)
>
> +2 because there were more than 10 victims.  (PSR, ¶ 228)
>
> +2 because this was a organized scheme to steal motor vehicle parts.  (PSR, ¶ 229)

That set the Adjusted Offense Level [AOL] at 24.  (PSR, ¶ 233)  Because the AOL for the §922(g)(1) charge was 14 (PSR ¶ 239) no points were added to the AOL for the thefts.  Mr. Feliberty's AOL, after USSG §3D1 grouping, remained at 24.  (PSR ¶ 241)

Finally, for pleading guilty in a timely manner, Mr. Feliberty's AOL was reduced by 3 points, establishing his TOL at 21.  (PSR ¶ 247)

**The CHC.**

As will be explained in further detail later in this memorandum, the defendant acknowledges that Probation accurately assessed 6 Criminal History Points [CHP's] based on sentences in 2013 and 2014 for two offenses which occurred in late 2009 and early 2010.  (PSR, ¶¶ 252 and 253)  That set Mr. Feliberty's CHC at III.  Mr. Feliberty is moving for a CH departure from CHC III to CHC II.

**The Appropriate Guidelines Sentencing Range.**

United States Probation, in the defendant's Presentence Report [PSR] calculated the defendant's Guidelines to be TOL 21

and CHC III, establishing a non-binding sentencing range of 46 to 57 months.  If Mr. Feliberty's CH departure motion is allowed, Mr. Feliberty's Federal Sentencing Guidelines will be TOL 21 and CHC II.  The sentencing range for those Guidelines is 41 to 51 Months.

**Motion for Criminal History Departure.**

Mr. Feliberty moves this Honorable Court to depart from CHC III to CHC II.  Mr. Feliberty received 6 CHP's for the sentences described in PSR, ¶¶ 252 and 253.  It is Mr. Feliberty's contention that he should receive just 3 CHP's for those sentences.  The Federal Guidelines state that, if reliable information indicates that the defendant's CHC substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.  USSG, §4A1.3(b)(1).

It is Mr. Feliberty's contention that 3 of the 6 CHP's he received were assessed because the State of Connecticut charged the defendant in March 2014 with a theft he committed in January 2010.  (PSR, ¶ 253)  Mr. Feliberty previously had been prosecuted in 2013 for a similar theft which occurred in November 2009.  (PSR, ¶ 252)  Mr. Feliberty was serving a three year sentence for the November 2009 offense when the State of Connecticut prosecuted him for the January 2010 offense.  As with the 2009

offense, Mr. Feliberty pleaded guilty.  Because the 2010 offense was similar to the 2009 offense, and because he received a three year sentence for the 2009 offense, Mr. Feliberty received a two year sentence for the 2010 offense, to run concurrent with the three year sentence for the 2009 offense.

It is likely that, had the State of Connecticut prosecuted both the 2009 and 2010 offenses in either 2013 or 2014, Mr. Feliberty would have resolved both offenses with concurrent three year sentences.  Had Mr. Feliberty been prosecuted for the 2009 and 2010 offenses at the same time, in either 2013 or 2014, and received concurrent three year sentences he would have been assessed only 3 CHC's for those two offenses.  See USSG, §4A1.2(a)(2).  There was no intervening arrest between the prosecution for the 2009 and 2010 offenses.  The prosecutions for the 2009 and 2010 offenses could have been included in the same charging instrument.

It seems that the State of Connecticut did not become aware of the 2010 offense until after the 2013 prosecution of the 2009 offense.  Had the State of Connecticut known of both the 2009 and 2010 offenses at the same time Mr. Feliberty likely would have been charged for both at the same time and in the same charging instrument.  He would have disposed of them at the same time, with concurrent three year sentences.

Under the circumstances explained above it is clear that Mr. Feliberty could have received just 3 CHP's for the sentences described in PSR §§ 252 and 253.  It is also clear that except for a string of offenses Mr. Feliberty committed in late 2009 and early 2010 (see PSR §§ 250, 252 and 253), he has no other criminal convictions.  The Court is not required to, but would be warranted in, finding that CHC II (2 or 3 CHP's) more accurately describes Mr. Feliberty's CH than CHC III (4 to 6 CHP's).

**A Sentence at the Low End of Mr. Feliberty's Guidelines, Regardless Whether the Court Allows Mr. Feliberty's CH Departure is the Appropriate Sentence for Mr. Feliberty.**

In making a sentencing determination, a court must consider all of the factors set forth in 18 USC, §3553(a), which include "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution."  Rita v. United States, 551 U.S. 338, 347-48 (2007).

It is this Court's task to arrive at a reasonable sentence that is "sufficient, but not greater than necessary," to comply with the "the basic aims of sentencing as set out above."  Rita, at 348.

It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

Gall v. United States, 552 U.S. 38, 52 (2007) (quoting Koon v. United States, 518 U.S. 81, 113 (1996))

As the Supreme Court explained in Irizarry v. United States, 553 U.S. 708, 713-14 (2008), any expectation that a criminal defendant would receive a sentence within the presumptively applicable guideline range did not survive Booker.  "[T]here is no longer a limit ... on the variances from Guidelines ranges that a District Court may find justified under the sentencing factors set forth in 18 U.S.C. §3553(a)" Irizarry, at 715.

As per the fiscal year 2022 United States Sentencing Commission's District of Massachusetts Statistical Information Packet (the latest available study, Ex. 2), 71% percent of all sentences (330 of 466 sentences) in this district were below the calculated Guideline Range (before considering any Guideline departure).  (Ex. 2, Table 8, p. 12)  Only 26% of all sentences in this district (120 of 466) are within the Guideline Range (before considering any Guideline departure).  (Id.)  In 58% of sentencings, where there was no departure or the government did not file a motion for a downward variance (151 of 271), Courts varied below the Guidelines over the Government's objection. (Id.)

There are a number of §3553(a) factors which support Mr.
Feliberty's contention that a low end Guidelines sentence is
appropriate.  Anecdotally, the Court is aware that when a
defendant, in a timely manner waives his right to a trial and
pleads guilty, he is afforded some consideration.  In addition to
receiving a 3 point Offense Level adjustment, defendants often
are sentenced to the low end of the appropriate Federal
Sentencing Guidelines.  As the 2022 United States Sentencing
Commission's District of Massachusetts Statistical Information
Packet indicates, many of those defendants receive below
Guidelines sentences.  The defendant has accepted responsibility
for his crimes, he has expressed his remorse and simply is
seeking a low end of the Guidelines sentence, a sentence which
many defendant's routinely receive and what is routinely
considered a fair and reasonable sentence.

Specifically, the defendant is asking the Court to consider
several other §3553(a) factors which support his contention that
a sentence at the low end of his Guidelines is appropriate:

1    He is 34 years old and has a prior criminal record, but
     not since he committed in late 2009 and early 2010.

2.   In 2013, he married Alisa Ruperto.  They have been a
     couple since 2008.

3.   He and Alisa have two young children, ages 3 and 6.  He
     is also a stepfather to Alisa's 15 year old son from a
     previous relationship.  Mr. Feliberty's 6 year old son
     is struggling with Mr. Feliberty's absence from home.
     While Mr. Feliberty has been detained awaiting

resolution of this case, his stepson was diagnosed with multiple sclerosis.

4.   Mr. Feliberty has been steadily employed since 2011.

5.   Mr. Feliberty has been dealing with PTSD since age 16, when he was shot while riding a minibike with friends in December 2006.

6.   Importantly, while detained at Wyatt, Mr. Feliberty completed an Adjustment to Incarceration program. (Ex. 3).

7.   Additionally, he has participated in, enjoyed and recognized the benefits of the inmate run restorative justice program called BOSS. Attached as Exhibits are Mr. Feliberty's BOSS attendance sheets through February 14, 2024 along with his completed written assignments covering topics such as Authenticity, Creating Miracles, Paying Forward, Positive Thinking, Rumination, Pit Stop, Believe in Yourself, Surrender, Being Present, Are You a Slave, What is Faith? and Choosing Friends.  Finally, with respect to BOSS, the inmate who ran BOSS, Harry Tam, wrote a letter to the Court in support of Mr. Feliberty.  (Ex.'s 4, 5 and 6)

8.   Mr. Feliberty, is aware that this Court recently sentenced co-defendant Nicolas Davila (who also has been indicted for First Degree Murder in Hamden County Superior Court) to 37 months and Mr. Feliberty is recommending a sentence than Nicolas Davila's sentence.

9.   The defendant is seeking a sentence at the low end of the appropriate Guidelines and the loss Probation attributed to Mr. Feliberty is at the low end of the range of loss which triggers the USSG §2B1.1(b)(1)(H) 14 point upward adjustment.  (PSR, ¶ 227)

10.  A number of friends and family have written heartfelt letters which explain to the Court the potential and good they see in Mr. Feliberty and the positive contributions Mr. Feliberty provides to his family.

**Oppositions to the government's PSR objections.**

The government contends that Probation's Guidelines calculations are wrong.

1. The government contends that Mr. Feliberty should be assessed 2 additional CHP's pursuant to USSG §2B1.1(b)(10)(C) (the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means).

2. The government also contends that Mr. Feliberty should be assessed 2 additional CHP's pursuant to USSG §2B1.1(b)(16)(B) (the offense involved possession of a dangerous weapon (including a firearm) in connection with the offense).

3. Finally, the government contends that 4 CHP's should be added to Mr. Feliberty's BOL of 14 for the violation of 18 U.S.C. §922(g)(1) pursuant to USSG §2K2.1(b)(6)(B). The government contends that in addition to the ammunition in the basement of his house, Mr. Feliberty possessed the firearm discovered on the elevated shelf of the detached garage and that the firearm was possessed in connection with theft offenses.

It is the government's contention that Mr. Feliberty's Federal Sentencing Guidelines are TOL 25/CHC III, establishing a non-binding sentencing range of 70 to 87 months.

As previously stated, Mr. Feliberty agrees with Probation's calculations and opposes the government's contention that Mr. Feliberty's Guidelines are greater that TOL 21/CHC III, with a sentencing range of 46 to 57 months. At the outset, Mr. Feliberty notes that Probation considered the government's objections and rejected them. Further, the government similarly

12

argued that Nicolas Davila was subject to the sophisticated means adjustment.  That argument was rejected by this Court.

**Sophisticated Means Enhancement**.

Application Note 9 (Application of Subsection 2B1.1(b)(10)) states that "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  The application note references locating a scheme in one jurisdiction but operating it in a different jurisdiction, the use of fictitious entities, corporate shells or offshore financial accounts.  Sophisticated means must involve some greater level of concealment than a typical theft of its kind.  United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015).

It is not enough that some greater level of execution or concealment was utilized, the defendant subject to the enhancement must intentionally engage in or caused the conduct constituting sophisticated means.  Prior to the 2015 amendments to the Federal Sentencing Guidelines, a defendant could receive a sentence enhancement where the offense generally involved "sophisticated means."  After courts in United States v. Green, 648 F.3d 569, 576 (7th Cir. 2011) and United States v. Jenkins-Watt, 574 F.3d 950, 965 (8th Cir. 2009) applied the enhancement irrespective of whether the defendant's own conduct

was "sophisticated" the Sentencing Commission clarified the scope of "sophisticated means".

Now, in order for the enhancement to apply, the defendant must intentionally engaged in or cause the sophisticated means. The Sentencing Commission added the requirement that the defendant "intentionally engaged in or caused the conduct constituting sophisticated means" in 2015 to clarify that application of this enhancement should be based "on the defendant's own intentional conduct" rather than "on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was 'sophisticated.'" United States v. Griffin, 76 F.4th 724 (7th Cir. 2023)

Finally, the defendant relies on Probation's response to the governments "sophisticated means" objection.  (PSR, pp. 104-105) In particular, at the top of page 105, Probation noted that "in reviewing the details of the thefts, especially the catalytic converter thefts, its is striking how repetitive and similar the conduct is in each incident, which ultimately made it easier to link the defendants to these thefts."

In its objections to the PSR (PSR, p. 101), the government argued that the defendant need not have done any of the things the government listed in order to qualify for the sophisticated means enhancement.  The government contended that the enhancement applies so long as the offense as a whole showed a greater level

of planning or concealment than a typical theft of its kind.
Citing Pacheco-Martinez, at 179 (a case involving a defendant
sentenced in 2013).  The government not only mis-characterized
the defendant's criminal conduct, it was relying on a judicial
interpretation of an older version of the sophisticated means
enhancement, which has been amended to limit the enhancement's
application to instances where the defendant engages in or causes
the sophisticated means.

The Court, as it did with respect to co-defendant Nicolas
Davila, should reject the government's sophisticated means
objection and find that Mr. Feliberty is not subject to a USSG
§2B1.1(b)(10)(C) enhancement.

**Firearm Enhancements.**

In addition to considering Probation's determination that
the firearm, discovered on an elevated shelf in Mr. Feliberty's
detached garage, was not possessed in connection with any crime
(including the thefts), the Court should consider that there is
not sufficient evidence to establish by a preponderance of the
evidence that Mr. Feliberty even possessed the firearm.

It is Mr. Feliberty's contention that, even if it is
determined that he possessed the firearm (he was unaware that

there was a firearm in the garage[2]), Probation accurately
assessed that the firearm (like the ammunition, which Mr.
Feliberty admits possessing) was not possessed in connection with
any other felony.

The government does not suggest that there is any evidence
showing that Mr. Feliberty physically possessed the firearm
discovered in the garage.  Thus, the government's theory must be
that he constructively possessed the firearm.  Constructive
possession is shown by proving that the defendant had "dominion
and control over the area where the contraband was found.  United
States v. Padilla-Galarza, 886 F.3d 1, 5 (1st Cir. 2018); United
States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992); see also
García-Carrasquillo, 483 F.3d at 130 (constructive possession
exists when a person knowingly has the power and intention at a
given time to exercise dominion and control over an object either
directly or through others).  Constructive possession "does not
require actual ownership," United States v. Ridolfi, 768 F.3d 57,

---

[2]    Since Probation did not find in its initial PSR that Mr.
Feliberty possessed the firearm, Mr. Feliberty did not object to
any contention that he possessed it in connection with any
offense.  Nevertheless, when he argued for release in April 2023,
after his arrest, he articulated that he did not know there was a
firearm in his garage and believed that it must belong to a
former tenant, Mr. Javon Gilkes.  (See Doc. 32, p. 2)

> Mr. Feliberty was unaware that the firearm was in the
> garage along with other items which belonged to a
> former (deceased) tenant, who was the brother of the
> current tenant.

62 (1st Cir. 2014), and can be established through circumstantial evidence, United States v. Howard, 687 F.3d 13, 20 (1st Cir. 2012).

The factors which support constructive possession are that the firearm was discovered in a building owned by the defendant's wife.  It was a building in which items similar to the ones he stole were discovered.  Finally, the defendant admits that in the basement of his home he was storing ammunition which belonged to Mr. Gilkes and was going to be retrieved from the defendant by Mr. Gilkes's family, who live in Virginia.

The factors which counter an inference that the defendant even knew about the firearm in the detached garage were that the firearm was discovered in a closed case on an elevated shelf of a garage which didn't just contain items that belonged to the defendant.  There was a car and other property which belonged to Mr. Gilkes.  There was no fingerprint or DNA evidence linking the defendant to the firearm.  Mr. Gilkes, as opposed to Mr. Feliberty, has a history of possessing firearms.  He was arrested and charged with drugs and firearms charges in Enfield, Connecticut on March 4, 2021.  (Ex. 7)  There is nothing about the location of the firearm which suggested that the defendant likely knew that it was there.  Cf. United States v. Creig, 717 F.3d 212, 219 (1st Cir. 2013) (defendant knew that there were lots of weapons in the apartment and that she was fully

knowledgeable that those weapons were there, at least in part, for preventing apprehension).

Importantly, and cited by Probation when it rejected the government's contention that Mr. Feliberty was subject to the firearm enhancements, "there was no evidence in this case that the defendant used the firearm or carried [the firearm] with him to any of the thefts, even after having been confronted by victim property owners and pursued by law enforcement.  There are no surveillance videos depicting the firearm in possession of the defendant during the thefts and there are no text messages between the co-conspirators about the defendant (or any other defendant) using firearms before, during, or after the thefts to facilitate the commission of those thefts."  (PSR, pp. 96-97)

The only gun in Mr. Feliberty's history is the one which shot him when he was riding a minibike with his friends when he was 16 years old.  He admitted holding the ammunition for his former tenant's family.  Most of the ammunition could not have been used in the unloaded firearm found in a case on a shelf in a garage which the former tenant used.

Even if the Court rules that the evidence supports a finding that the defendant constructively possessed the firearm, in order for a person to possess a gun in connection with a crime, the government must establish a sufficient nexus between the firearm and the crime such that the firearm advances or promotes the

18

crime, United States v. Ramirez-Frechel, 23 F.4th 69, 74 (1st
Cir. 2022) (citing United States v. Pena, 586 F.3d 105, 113 (1st
Cir. 2009)).  "In connection" can be analyzed from both objective
and subjective viewpoints, taking into account that the element
lacks "a settled, inelastic, definition." Id.  As to objective
factors, courts consider (1) the proximity of the firearm to
contraband; (2) whether the firearm was easily accessible; (3)
whether the firearm was loaded; and (4) the surrounding
circumstances." United States v. Bobadilla-Pagán, 747 F.3d 26,
35 (1st Cir. 2014).  A subjective factor could be, for example,
evidence that a defendant obtained a firearm to protect drugs or
proceeds. United States v. Pérez-Greaux, 83 F.4th 1 (1st Cir.
2023).

    For many of the same reasons cited above, against a finding
that Mr. Feliberty constructively possessed the firearm, and
because of the reasoning articulated by Probation in opposition
to the government's objections 2 and 3 (PSR, pp. 95-97 and 100),
the Court should rule that the firearm enhancements to not apply
to Mr. Feliberty.

    **Conclusion.**

    Mr. Feliberty respectfully requests that the Court sentence
him to a period of incarceration at the low end of the Guidelines
Range for TOL 21/CHC III (46 months) or, if the Court allows the
defendant's CH departure motion, TOL 21/CHC II (41 months).

Respectfully submitted
SANTO FELIBERTY,

By his Attorney:

**Date:** March 20, 2024          /s/  Thomas Kerner

‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
Thomas Kerner
Attorney at Law
MA BBO No. 552373
240 Commercial St., Suite 5A
Boston, MA  02109
(617) 720 5509
thomas.kerner@comcast.net


## CERTIFICATE OF SERVICE

I, Thomas Kerner, herein certify that on this 20th day of March, 2024, a copy of the within document was e-filed for all parties involved.

**Date:** March 20, 2024          /s/ Thomas Kerner

‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗
THOMAS KERNER